**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert REESOR and Herbert Tanner,**
**Defendants–Appellants.**

Nos. 98–6092, 98–6310, 98–6311.

United States Court of Appeals,
Sixth Circuit.

May 7, 2001.

---

* The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

Before KRUPANSKY, BOGGS, and BATCHELDER, Circuit Judges.

PER CURIAM.

Defendants Reesor and Tanner were convicted by a jury of making false claims to the Internal Revenue Service and of participation in a conspiracy to make false claims, in violation of 18 U.S.C. §§ 286, 287. Tanner was separately tried and convicted of bankruptcy fraud, 18 U.S.C. § 152; he was simultaneously sentenced for both convictions. Reesor was sentenced to 24 months in prison in July 1998 and is currently on supervised release. Tanner was sentenced to 63 months in prison in August 1998 for the tax violations; his 37–month sentence under the bankruptcy laws runs concurrently with his other sentence. Both Reesor and Tanner appeal their convictions and sentences on several grounds. For the reasons that follow, we affirm the jury verdicts and the rulings of the district court.

I

In the early 1990s, Tanner and Reesor were Memphis businessmen engaged, inter alia, in the home improvement business. They formed a corporation called "Federal Tax Assistance" ("FTA") in June 1992, which trial evidence showed was used to carry out an extensive, albeit cumbersome, scheme to defraud the IRS. Defendants engaged people to solicit welfare recipients living in public housing to file false tax returns, claiming an earned-income credit ("EIC") to which they were not entitled. Paid $5 a name, the solicitors would collect information such as social security numbers and get individuals to sign a form purporting to be a power of attorney labeled "Application for EIC." The information would then be converted into a tax return claiming self-employment on Schedule C and an earned income tax credit in varying amounts. Because the returns were filed with return addresses controlled by defendants, Tanner and Reesor re-

ceived the wrongfully awarded refund checks, which they cashed.

Tanner and Reesor asked a woman named Caroline Bradshaw, a friend of Tanner's and a local Avon representative, to help prepare the returns based on information solicited from the housing residents. Other individuals were also hired to prepare the returns. Bradshaw testified that she cashed several Treasury checks that she received, already endorsed, from Reesor and Tanner. The defendants netted $14,224.67 from the operation, although the sum total of refunds claimed through FTA was $287,632.34, because the majority of the refunds were rejected by the Internal Revenue Service ("IRS") during processing, often because the Social Security numbers on the tax forms were invalid.

The "tax assistance" appears to have continued through the summer and fall of 1992, generating EIC claims for the 1991 tax year. In October 1992, IRS criminal investigators began interviewing defendants, their suspicion aroused by the hundreds of "self-employed" people purportedly living at 6880 Hillshire Dr., Number 20 in Memphis, Tennessee or using P.O. Box 11806, and engaged in such businesses as painting, parking, "freelance," "housewife," and child care. Reesor and Tanner were interviewed a number of times, and an indictment was filed in 1997 charging them with 30 counts of filing false claims and causing such claims to be filed.

Also during the early 1990s, Tanner engaged in questionable business dealings of a somewhat different variety. Just after the active operations of Federal Tax Assistance were drawing to a close in November 1992, Tanner filed a voluntary bankruptcy petition in the Western District of Tennessee under Chapter 11 of the Bankruptcy Code. He refiled the petition on January 11, 1994 under Chapter 7. This petition included a schedule disclosing Tanner's real property on which was listed one item, a triple-mortgaged personal residence in Germantown, Tennessee held in tenancy by the entirety with his then-wife. A trustee named George Stevenson was appointed to handle the bankruptcy. When Tanner did not appear for the required creditor's meeting, the case was dismissed. Stevenson, however, had apparently learned that Tanner had undisclosed real property in Missouri. Acting on this tip, Stevenson moved to reopen the proceedings in order to seek further assets from Tanner. It turned out that the Missouri property had been held by Tanner for many years and was connected to a lawsuit in which Tanner had received $150,000 by settlement, terminating his property interest on January 12, 1994; the lawsuit was dismissed pursuant to the settlement on January 18, 1994. The lawsuit, land, and proceeds of the settlement were not disclosed in the bankruptcy petition, nor was any relevant interest listed as a debt owed to Tanner. This failure to disclose assets, along with miscellaneous other misstatements on the petition, formed the basis for a set of charges against Tanner alone, alleging violations of 18 U.S.C. § 152, which appeared in the February 1997 indictment as Counts 31–35.

Trial was held on the tax charges in April 1998. Prior to trial, Reesor had sought to sever his trial based on the inclusion of those counts not involving him. However, when the government decided to pursue the bankruptcy charges separately, this motion was dismissed as moot. Prior to voir dire, Reesor "renewed" his motion for severance because he could not inquire about associations jurors had with the name "Tanner." Reesor and Tanner were represented by separate counsel, and both testified. When Tanner testified, he was impeached by the government with evi-

dence of his 1986 convictions for credit card fraud, which arose from a magazine solicitation business he was then running. When it was determined these convictions were going to come into evidence, Reesor "renewed" yet again his motion for severance, but this was denied. Tanner's essential theory was that false information was given to him by the solicitors, that he was ignorant of tax law and was not aware of the illegality of his acts, and that he fully intended to give the checks over to the claimants but had not gotten around to it yet. Reesor's theory was that FTA was Tanner's operation, that he didn't know much about it, and that he had been misled by Tanner into believing it was legal.

During the trial, Reesor attempted to bring in information about his codefendant's brother, William Tanner,[1] only being dissuaded from doing so by a stern warning (outside the presence of the jury) that threatened him with contempt of court. At this point, Tanner sought a mistrial based on the alleged tainting of the jury; this was denied. Reesor was acquitted of some charges (each of which alleged a different false claim on behalf of a particular solicited claimant) and was convicted of others. Tanner was convicted on all counts.

A separate trial was held on the bankruptcy charges in July 1998. Tanner presented a theory that he had simply been confused by the bankruptcy form and the requirements of disclosure, and had not acted with the requisite criminal intent to defraud. The jury found Tanner guilty on all counts. Tanner then moved to consolidate his sentencing for both sets of convictions.

Just prior to his sentencing on August 31, 1998, Tanner filed a motion for a new trial of tax charges based on newly discovered evidence. This "new evidence" was the affidavit of Bradshaw, who reported that on April 29, 1998, during a break in jury deliberations during the first trial, she witnessed Tanner get into a dispute with an employee in the federal building lunchroom over whether or not Tanner had paid for his lunch. Bradshaw stated that the jury was present during the dispute and within sight and hearing of it. This motion was denied in October 1998 because the evidence was not new and could have been brought up and resolved at trial. Tanner has supplemented the record with his own affidavit dated June 1999, in which he states that he was so emotional during his trial that he forgot about the incident, and, as a non-attorney, did not realize its significance at the time.

On appeal, Tanner asserts seven grounds for relief. He claims there was insufficient evidence to convict him of violations of (1) 18 U.S.C. §§ 286, 287 in his first trial or (2) 18 U.S.C. § 152 in his second trial. He further claims (3) that a mistrial should have been declared when Reesor supposedly tainted the jury against him, or (4) that he should have received a new trial because the jury witnessed him disputing the lunch bill in the court cafeteria. Tanner also claims (5) that an evidentiary error in his tax fraud case occurred when his prior convictions were used to impeach him. Next, Tanner claims (6) that his offenses from his separate trials were improperly grouped during sentencing, and makes several other sentencing

---

1. It appears that defendant Tanner's older brother, William Tanner, is a multi-millionaire and a well-known legitimate businessman in Memphis. The elder Tanner has a controversial reputation due to widely-publicized civil litigation against him in the 1980's as well as his own past criminal troubles with the Internal Revenue Service. *See Tanner v. Caplin & Drysdale,* 24 F.3d 874, 874–77 (6th Cir.1994) (giving a history of these matters in the context of a collateral legal malpractice suit).

objections. Finally, he asserts (7) that an evidentiary error in his bankruptcy case occurred when his cross-examination of bankruptcy trustee Stevenson was limited.

In his separate appeal, Reesor raises six issues for our consideration. Reesor claims (1) that his trial should have been severed from that of Tanner. He also claims that (2) there was insufficient evidence to sustain his convictions under 18 U.S.C. §§ 286, 287. In addition, Reesor asserts that the district court improperly denied his motions for two jury instructions, (3) one dealing with "advice of counsel," and (4) another describing the requirements for "multiple conspiracies." Although he is now out of custody, Reesor's appeal also contested whether his sentence (5) improperly reflected relevant conduct not a part of the offense of conviction, (6) should have been reduced by four offense levels by classing Reesor as a "minimal participant" under USSG § 3B1.2(a).

## II

### Standard of Review

■ When a defendant claims on appeal that there is insufficient evidence to support his conviction, we view the evidence "in the light most favorable to the prosecution." *Jackson v. Virginia,* 443 U.S. 307, 309, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Wright,* 16 F.3d 1429, 1439 (6th Cir.1994). In doing so, we credit all "reasonable inferences" that support the jury's verdicts. *See United States v. Stone,* 748 F.2d 361, 362 (6th Cir.1984). The conviction will be upheld so long as any rational juror could have reasonably concluded that there was adequate evidence to support the verdict. *See ibid.* "The government must be given the benefit of all inferences which can reasonably be drawn from the evidence ... even if the evidence is circumstantial." *United States*

*v. Leal,* 75 F.3d 219, 222 (6th Cir.1996) (quoting *United States v. Adamo,* 742 F.2d 927, 932 (6th Cir.1984)).

■ As to the appeals based on claimed misapplications of the Guidelines, this court reviews the district court's factual findings for clear error, and, while giving due deference to the district court's application of the guidelines to those facts, it reviews de novo the district court's legal conclusions. *United States v. Russell,* 76 F.3d 808, 812 (6th Cir.), *cert. denied,* 519 U.S. 841, 117 S.Ct. 121, 136 L.Ed.2d 72 (1996). The 1997 guidelines are used for this case. The standards of review appropriate to the other claims of the defendants will be briefly noted in the relevant portions of the opinion.

### HERBERT TANNER

#### *Insufficiency of Evidence (§§ 286, 287)*

■ There was ample evidence to support the verdict of the jury in Tanner's false claims trial. Tanner's only defense on these charges is that he did not know what he was doing, and it is unconvincing. Numerous witnesses, who had worked as solicitors or who had been recruited as claimants, testified to the modus operandi of FTA. Tanner admitted that he endorsed checks in the names of tax claimants, and there was evidence that he held himself out as the one responsible for getting the money to the claimants—something there is equally mountainous evidence to show never occurred. Belying Tanner's claims that he was deceived by unreliable solicitors was testimony such as that of Georgia Johnson, whom Tanner recruited specifically to get information from those on AFDC, in direct violation of the law, and whom he told to put food stamp receipts on the line marked "income," thus providing the basis for a false claim when this information was converted by a preparer

into a tax return. Sometimes, as appears probable from his accumulation of signed but otherwise blank forms, Tanner simply made up an income figure. A jury could easily conclude that Tanner's claims of ignorance about the requirements of the EIC program were completely implausible.

### Insufficiency of Evidence (§ 152)

Tanner's assertion that there is insufficient evidence for his bankruptcy fraud conviction, like his assertion regarding his false claims conviction, relies heavily on his claim that he lacked any criminal intent and was merely ignorant of the niceties of federal law. Tanner claimed he had no desire to conceal assets or give a false oath under a penalty of perjury, but this is implausible. Tanner's petition for bankruptcy omits not one item but several items that he was required to disclose, and many of the undisclosed facts were the very ones that would have revealed the Missouri property, which was his primary asset apart from his heavily mortgaged home. The closeness in date between the refiled bankruptcy petition on January 11 and the sale of the farm on January 12 indicates rather strongly that the petition was filed with knowledge of and in relation to the Missouri property. It is reasonable to infer that Tanner had some strategic purpose in converting the real property into cash—which went into a checking account Tanner also "forgot" to reveal on his petition—before seeking relief against his creditors. Tanner might choose to characterize the property interest he had in the proceeds of the farm on January 11 in various ways: as a debt owing him; as cash; as real property; or simply as an unliquidated claim against the purchasers. But there are places on the petition for all these interests—and they are all blank. A jury could find that, given the great value the omissions had to Tanner, they were

purposeful and in violation of 18 U.S.C. § 152.

### Reesor's Alleged Prejudice of Tanner's Jury

We review a district court denial of a motion for mistrial for an abuse of discretion. *United States v. Atisha,* 804 F.2d 920, 926 (6th Cir.1986). In order for a mistrial to be warranted, the admitted evidence on which it is based must render the trial unfair. *Ibid.* "Only if the erroneously admitted evidence is of an exceptionally prejudicial character, such that its withdrawal from consideration by the jury cannot be expected to remove the harm, will it be appropriate to grant a new trial." *United States v. Carr,* 5 F.3d 986, 993 (6th Cir.1993).

Reesor was asked, on direct examination, whether he was still in the home improvement business with Tanner in July or August of 1992. Reesor responded: "No, he [Tanner] went to work for his brother, started a shuttle company to go to Splash Casino." Perhaps because he misheard Reesor's "shuttle company" as "shell company," Tanner's counsel objected and the interchange ensued in which Reesor was warned not to bring up irrelevant information about Tanner's family. Then Tanner's counsel, perceiving the judge to have been displeased with the evidence that had just come in, moved for a mistrial. However, Reesor's comments gave little information to the jury and what it gave was only indirectly applicable to Tanner, referring instead to his brother (who was not even mentioned by name). Moreover, Reesor's comments did not seek to create "guilt by association," at most creating only "association." Tanner's claims of prejudice are speculative at best. Therefore it was not an abuse of discretion to deny the motion for a mistrial.

### Tanner's "New Evidence" as Basis for a New Trial

We will not reverse the district court's ruling on a motion for new trial absent a clear abuse of discretion. *United States v. Seago*, 930 F.2d 482, 488 (6th Cir.1991) (citing *United States v.. O'Dell*, 805 F.2d 637, 640 (6th Cir.1986)). Motions for a new trial based on newly discovered evidence should be granted with caution. *O'Dell*, 805 F.2d at 640 ("Motions for a new trial based on newly discovered evidence are disfavored."). The defendant bears the burden of showing that a new trial ought to be granted, and must establish that: (1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce acquittal. *Seago*, 930 F.2d at 488 (citing *O'Dell*, 805 F.2d at 640). Tanner's motion seems to be weak on at least two fronts. First, the evidence is not new, and second, it is not "likely" to produce an acquittal on the charge of submitting false claims.

This is not contrary to a rule allowing defendants a hearing if they can show a colorable claim of extrinsic influence on a jury. *See United States v. Davis*, 177 F.3d 552 (6th Cir.1999); *United States v. Herndon*, 156 F.3d 629 (6th Cir. 1998). The Supreme Court has held "that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Where a colorable claim of extraneous influence has been raised, a *"Remmer* hearing" is necessary to provide the defendant with "the opportunity to prove actual bias." *Ibid.* In

*Remmer v. United States*, 347 U.S. 227, 230, 74 S.Ct. 450, 98 L.Ed. 654 (1954), it was held that a hearing was required to "determine the circumstances, the impact thereof upon the juror, and whether or not [they were] prejudicial."

However, a new trial will not be necessary every time a question of juror partiality is raised. *Smith*, 455 U.S. at 217, 102 S.Ct. 940. The cases supporting a hearing appear to be distinguishable on the ground that the motion for mistrial was made at the trial, something absent here. They are further distinguishable on the ground that the extrinsic influences involved were not generated by the defendant himself. To require a mistrial or even a *Remmer* hearing on the basis of actions taken by the defendant would obviously create a serious potential for mischief. Tanner gives no contrary authority supporting a jury influence claim based on the defendant's own misbehavior during trial, whether in or out of the courtroom.[2] We therefore hold that no abuse of discretion occurred in denying relief to Tanner based on his and Bradshaw's recitation of the lunchroom incident.

### The Use of Tanner's Prior Convictions

Tanner's convictions for credit card fraud were more than ten years old at the time of his trial, and thus barred from evidence under Fed.R.Evid. 609(b), unless their probative value substantially outweighs the prejudice involved. However, in *United States v. Sloman*, 909 F.2d 176, 181 (6th Cir.1990), we held that a district court does not necessarily commit an abuse of discretion, even when there are no exceptional circumstances, when it considers factors that include, inter alia, "the

---

**2.** Whether it is wise for jurors to have lunch in the same area as criminal defendants is a question not before us.

impeachment value of the prior crime," "the importance of the defendant's testimony," and the "centrality of the credibility issue." All of these factors are implicated in the current case, since Tanner's main defense hinged on the jury believing his claims about his state of mind. It is plausible that the admission of these convictions hurt Tanner's image as an honest businessman, but the district court could reasonably have thought it unfair for the jury to not be privy to the crucial impeachment that might be able to pierce Tanner's alternative version of the facts. Therefore there was no abuse of discretion.

### Tanner's Sentence

■ Tanner's tax scheme and his concealment of $150,000 in assets were grouped together as acts of fraud and deceit. USSG § 3D1.2(d). This gave a total intended loss figure of $437,632.84, which, using USSG § 2F1.1, translated into a nine-level enhancement of Tanner's sentence. The statutes under which Tanner was charged, 18 U.S.C. §§ 286, 287, use the fraud table (USSG § 2F1.1) just as the bankruptcy charges do. *Cf.* USSG § 2T4.1 (covering tax evasion under 18 U.S.C. § 7201); *United States v. Williams*, 154 F.3d 655 (6th Cir.1998) (holding bankruptcy and tax charges were improperly grouped when the offense level enhancement for the scale of each charge is measured on different tables). The calculation appears to be correct, and Tanner raises no authority to show the grouping was improper.

■ Tanner raises, seriatim, four other sentencing challenges, not separately numbered. These relate to the imposition of two-level enhancements for violation of a judicial order in his bankruptcy sentence, and for more than minimal planning even though he had already received the leader-organizer enhancement (which Tanner asserts is double counting). These claims have been directly foreclosed, respectively, by *United States v. Guthrie*, 144 F.3d 1006, 1010 (6th Cir.1998), and *United States v. Cobleigh*, 75 F.3d 242, 251 (6th Cir.1996). Tanner also claims that the version of the Guidelines in force at the time of the offense should govern, and that the government can only prove between $10,000 and $20,000 in loss and that this amount should have been used to measure the seriousness of Tanner's false claims charges under USSG § 2F1.1. These challenges are also without merit. A measure of the level of *intended* loss, based on the total amount of refunds sought from the IRS, was available to the district court. Under a preponderance of the evidence standard, that evidence was sufficient to determine the figure for which Tanner should be held responsible. There is no support for the retroactivity claim he appears to be making. *United States v. Holmes*, 975 F.2d 275, 278 (6th Cir.1992). Therefore, we find no error in Tanner's sentence.

### Cross–Examination of Stevenson

■ We review a district court's restriction of the scope of defense inquiry, like other evidentiary issues, for an abuse of discretion. *See United States v. Owens*, 159 F.3d 221, 226–27 (6th Cir.1998). During the bankruptcy trial, Tanner attempted to use his cross-examination of Stevenson to show the purported vagueness of the petition form (important for Tanner's "mere misunderstanding" defense). He did this by asking Stevenson to define terms used in the petition like "homestead association" or "thrift." The court allowed this for a time, but then sustained a government objection for relevancy to bring it to a close. The court's reasoning (at the bench) was that Stevenson's knowledge about parts of the form not involved in the

case bore limited relevancy to whether *Tanner* knew what "real property" meant (by implication, whether he knew his farm was real property). The court pointed out that the form spoke for itself and provided a basis for arguing vagueness and confusion on the part of Tanner, and limited further examination to the parts of the form relevant to the current case. This did not stop Tanner from mounting his defense, and was not an abuse of discretion.

ROBERT REESOR

*Denial of Reesor's Motion for Severance*

◼ Reesor's first claim is for the denial of his motion for severance. We will reverse such a ruling only upon finding a "clear abuse of discretion." *United States v. Fischl*, 797 F.2d 306, 313 (6th Cir.1986). Generally, there exists a "preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). "The jury must be presumed capable of sorting out the evidence and considering the cases of each defendant separately." *United States v. Moore*, 917 F.2d 215, 222 (6th Cir.1990). The burden is on the appellants to produce "a strong showing of factually specific and compelling prejudice" that will "mislead or confuse the jury." *Id.* at 221 (quoting *United States v. Vinson*, 606 F.2d 149, 154 (6th Cir.1979)). Reesor himself seemed ambivalent about whether comparison with the more culpable Tanner helped him by making him appear more like another dupe and victim, or hurt him by association. Certainly, Reesor has not demonstrated any factually specific and compelling prejudice—only vague speculation that jurors might have had some preconceived notion about either the name Tanner or about guilt by association and that this might have hurt him.

*Insufficiency of Evidence for Reesor's Conviction*

◼ The evidence produced at trial against defendant Reesor was less overwhelming than that against Tanner, but hardly insufficient to support a conviction for violating 18 U.S.C. §§ 286, 287. In order to sustain a conviction under the substantive count for presenting false, fictitious or fraudulent claims to the United States under 18 U.S.C. § 287, the government must prove that: 1) the defendant presented a false or fraudulent claim against the United States; 2) the claim was presented to an agency of the United States; and 3) the defendant knew that the claim was false or fraudulent. *United States v. Franklin*, No. 97–6137, 1998 WL 808253 (6th Cir. Nov.10, 1998) (unpublished); *United States v. Okoronkwo*, 46 F.3d 426, 430 (5th Cir.1995). To sustain the conspiracy conviction under 18 U.S.C. § 286, the government must prove that: 1) there was a conspiracy to defraud the United States; 2) the defendant knew of the conspiracy and intended to join it; and 3) the defendant voluntarily participated in the conspiracy. *See Okoronkwo*, 46 F.3d at 430; *Franklin*, 1998 WL 808253 at *1.

◼ Taking the evidence in the light most favorable to the prosecution, it showed Reesor to have been aware the tax business was going on and to have sought benefit from it. It showed Reesor engaged in negotiating refund checks, kept records of the checks, had returns prepared, knew how the information was solicited, and mailed returns to the IRS. He could thus could be found to be at least familiar with all the steps of the business. A rational jury could well find that someone who saw how the operation worked would realize its criminal nature, satisfying the requirements for conviction for conspiracy. Even if it were plausible that

Reesor was unaware of the illegal nature of the business at the beginning, it is far less plausible that he remained so as the scheme progressed and no checks were transferred to clients. Although Reesor claims he was assured by Tanner that all was legal, there was testimony from an accountant, Martin Greenberg, who stated that he had refused Reesor's request to become a tax form preparer for the EIC scheme, telling Reesor that $5 a return wasn't enough to get him to do something that was illegal. A jury, given all the evidence of Reesor's knowledge, could have concluded, at minimum, that he learned of its fraudulent nature but continued to participate voluntarily in what he then knew to be a conspiracy, 18 U.S.C. § 286, and that, as to specific false claims, he had knowledge of the fraudulent nature of the claims being made.

### Reesor's Proposed Jury Instructions

■■■ Reesor's third and fourth claims involve jury instructions, which are reviewed for error based on whether "the charge, taken as whole, fairly and adequately submits the issues and applicable law to the jury." *United States v. Hoglund,* 178 F.3d 410, 412 (6th Cir.1999) (citation omitted). Reesor sought an instruction based on his conversations with James Allison, Tanner's attorney, who had been consulted during the initial stages of the tax assistance business, and whom Reesor later called for information about how one with a power-of-attorney endorses a check made out to another. Reesor also sought an instruction based on his theory that he had only known about the tax assistance business as a limited operation and that there was a separate, more extensive, conspiracy centered around the formation of FTA (as to the existence of which Reesor denied knowledge).

■■■ The evidence did not support a general instruction on the defense of advice of counsel. The elements of a reliance on counsel defense are (1) full disclosure of all pertinent facts to counsel, and (2) good faith reliance on counsel's advice. *United States v. Lindo,* 18 F.3d 353, 356 (6th Cir.1994). However, the evidence appears to indicate that Allison only told defendants that the *purported* object of FTA was legal; this would have involved the identification of people who genuinely qualified for an EIC and the taking of a commission for obtaining the refund. Reesor never discussed with Allison the *actual* details of the operation targeting recipients of public assistance. The district court did not abuse its discretion in denying the instruction.

■■■ Nor does the mere fact that Reesor did not know all of the low-level participants in or specific features of FTA mean there was evidence to support the giving of a multiple conspiracy instruction. *See United States v. Moss,* 9 F.3d 543, 551 (6th Cir.1993). Moreover, the testimony at trial indicated Reesor knew the fundamentals of all aspects of the operation, although he did not participate in it consistently or oversee the processing of all the returns. The use of multiple addresses certainly does not indicate there were multiple schemes afoot—had the participants been more clever, they would have used even more addresses (such as post office boxes) to allay suspicion. The evidence at trial supported only the idea of a single conspiracy centered on FTA, which from beginning to end had a single goal and modus operandi. The district court did not abuse its discretion in denying the instruction.

### Reesor's Sentence

■■■ USSG § 1B1.3 provides that a defendant may be held accountable for jointly undertaken criminal conduct if it was

reasonably foreseeable. The district court's determination of forseeability under a standard of preponderance of the evidence is a question of fact that we can disturb only if it is clearly erroneous. It was not clearly erroneous to find that even if Reesor did not actively participate in all acts of the conspiracy beyond a reasonable doubt (accounting for his acquittals on some of the thirty individual counts of filing false claims), there was a preponderance of evidence that he foresaw them. As discussed above, the evidence could be taken to show that Reesor knew that the transactions in which he was involved were fraudulent, and that he knew that Tanner was engaging in other similar transactions in which he was not directly involved. Thus, such fraudulent conduct was reasonably foreseeable by Reesor.[3]

██ In order to be a minimal participant entitled to a four-level reduction in offense level under USSG § 3B1.2(a), a defendant must play only a single limited role in the conspiracy. *United States v. Williams*, 940 F.2d 176, 180 (6th Cir.1991). It is the "defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others" that marks the minimal participant. USSG § 3B1.2, comment. (n.1). Reesor played several roles. These included recruiting others, keeping records and, especially, the important role of attempting to find a way to negotiate the Treasury checks that FTA managed to receive. This does not accord with the definition of the minimal participant; indeed, the government at one time sought

to apply the enhancement for leader and organizer to Reesor, but the district court rejected this enhancement by viewing both Reesor and Bradshaw as being under the sway of the real organizer of the scheme, Herb Tanner. The finding of the district court that Reesor was not a minimal participant is not clearly erroneous.

### III

Because Tanner and Reesor have not shown there is insufficient evidence for their convictions, and because we find no error in their sentences under the Guidelines, nor merit in their various procedural claims, we AFFIRM Tanner's convictions in Nos. 98–6310, 98–6311 and his sentence, and we AFFIRM Reesor's conviction and sentence in No. 98–6092.

---

**3.** Reesor, on appeal, argues that the court's assessment of relevant conduct regarding the acquitted counts should have been conducted under a clear and convincing standard of evidence, which he acknowledges he did not argue for at the time and thus must submit for review as a plain error. (Reesor Br. at 51). However, Reesor gives no authority to support the idea that this question of law is "plainly" settled in the Supreme Court, and we have previously held it is not error, much less plain error, to use the preponderance of the evidence standard, foreclosing Reesor's argument. *United States v. Ward,* 190 F.3d 483, 492 (6th Cir.1999).