NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0266n.06

No. 08-5921

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Apr 29, 2010

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA

    Plaintiff-Appellee,

v.

CHRISTOPHER BLAKELY

    Defendant-Appellant.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
WESTERN DISTRICT OF
TENNESSEE

_____/

BEFORE:    MARTIN, CLAY, and KETHLEDGE, Circuit Judges.

    BOYCE F. MARTIN, Jr., Circuit Judge. Defendant-Appellant Christopher Blakely was indicted by a federal grand jury and charged with (1) one count of possession with the intent to distribute and distribution of 34.8 grams of crack on August 1, 2006, in violation of 21 U.S.C. § 841(a)(1); (2) one count of possession with the intent to distribute and distribution of 57.2 grams of crack on August 10, 2006, in violation of 21 U.S.C. § 841(a)(1); and (3) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). The district court severed the drug counts from the firearms count, and the case went to trial on the drug counts only. The jury found Blakely guilty on both drug counts, and the district court sentenced Blakely to concurrent terms of 151 months in prison on each count. Blakely now appeals his convictions, arguing that (1) the district court improperly denied his request for a mistrial or for a curative instruction regarding improper

testimony from a government witness and (2) the court improperly prevented him from cross-examining a government witness on the circumstances of a prior conviction. For the reasons set forth below, we **AFFIRM**.

## I.

Blakely was charged with two counts of possession with the intent to distribute and distribution of cocaine base (crack), in violation of 21 U.S.C. § 841(a)(1). The first count concerned a transaction on August 1, 2006, during which Blakely was alleged to have sold 34.8 grams of crack to a confidential informant ("CI").[1] The second count arose from a transaction on August 10, 2006, during which Blakely was alleged to have sold 57.2 grams of crack to the same CI. Each transaction was orchestrated by the police, and was to be arranged by a recorded telephone call between the CI and Blakely. Then, each transaction was supposed to be video recorded.

The CI was being "handled" by Officer Charles Mathis. On each date, the CI contacted Blakely via telephone, and those conversations were recorded. However, for each occasion, it seems that Blakely and the CI had also spoken prior to the recorded telephone call, and those conversations were not recorded. According to the government witnesses, including the CI, it was during these two unrecorded phone calls that Blakely and the CI discussed quantity and price. In neither recorded conversation was there any specific, explicit reference to drugs. Instead, the recorded conversations were cryptic and generally concerned the logistics as to when and how the two would meet.

For the August 1 transaction, Blakely and the CI apparently agreed that the CI would

---

[1]As the district court records regarding the informant's identity remain under seal to protect the informant's identity, we refer to him only as the CI.

purchase 1.5 ounces of crack from Blakely in return for $1,050. On the recorded phone conversation, the CI asked Blakely if he was ready, to which Blakely responded in the affirmative; the CI also asked "ten fifty, right?" and again Blakely responded in the affirmative. The CI then told Blakely that he would meet Blakely in approximately twenty minutes. Officer Mathis then searched the CI to ensure that he did not have any drugs on him and gave the CI $1,050. Another officer outfitted the CI with a video and audio recorder. The officers then drove the CI to the agreed-upon location to meet Blakely.

The CI approached the house and started speaking with Blakely. The conversation lasted for a relatively long while—over a half hour—and, during the conversation, the video and audio equipment concealed under the CI's clothes failed. However, officers witnessed the CI and Blakely walk into an apartment together and exit a few minutes later. The CI then walked away and was picked up by the police officers. The officers searched him and found approximately 36 grams of crack. Though the video recording failed prior to the actual exchange, the video does show that Blakely was present, along with others. Furthermore, the CI testified that he had purchased the drugs from Blakely, not someone else in the apartment.

The transaction on August 10 proceeded in roughly the same fashion, except that the plan was to purchase 2.5 ounces of crack instead of 1.5 ounces. The CI called Blakely to arrange the meeting, was searched by police officers and then given money to buy drugs, went to see Blakely, and returned with drugs. This time, although the A/V equipment did not fail, it became partially covered by the CI's shirt. Thus, again, there was no video of the actual exchange of drugs for money. However, there was audio, and Blakely can be heard discussing the need to go get the

"stuff" from someone else,[2] and then later Blakely can be heard asking the CI to count out the money.

Blakely's appeal takes issue with two discrete evidentiary rulings. To put the rulings in context, we describe generally how the government's proof came in. First, Officer Mathis testified. He discussed how he became associated with the CI, the preparations for the two transactions, and the result of the transactions. He indicated that he had discussed with the CI the two unrecorded conversations in which the CI and Blakely had determined amount and price, he was listening to the two recorded phone calls between the CI and Blakely, he was present when the CI was searched prior to each transaction, and he ultimately took custody of the drugs after the CI left the apartment.

Next, Agent Christopher Rogers, an ATF agent working with the local police, testified. He worked with Officer Mathis and the CI on the two transactions, as well as on a related firearms investigation. Agent Rogers was also listening to the phone conversations on August 1 and August 10. Acting undercover, he drove the CI to the apartment on both occasions and remained in the car while the CI went inside to conduct the transaction. He also initially took custody of the drugs when the CI returned to the car, and then he gave the drugs to Officer Mathis.

The final witness relevant to this appeal was the CI.[3] He had a long criminal record, and he had recently been arrested on a state charge of aggravated assault and a federal charge of being a

---

[2]It appears that, for both transactions, Blakely acted as a broker. In neither instance did he actually have the drugs in his possession when the CI called. Instead, Blakely would retrieve the drugs from someone else once he was sure that the CI had the required money. He would then give the CI the drugs and take the money.

[3]Two lab technicians also testified as to the identity of the substance retrieved from the CI. Blakely also called two witnesses, neither of which are material to this appeal.

felon in possession of a firearm.  The two charges arose out of the same incident.  He had agreed

with authorities to trade information and cooperation for consideration at sentencing.  He told the

authorities that he knew individuals that dealt drugs and guns out of a housing project called

Allenton Heights.  The agents then worked with the CI to arrange for the drug buys from Blakely.

The CI generally testified consistently with Officer Mathis and Agent Rogers, though due to the

video equipment issues, he was the only witness who could testify about the actual exchange of

drugs for money.

## II.

### A.    Testimony of Agent Rogers Regarding His Interpretation of Phone Calls

The first issue on appeal concerns testimony elicited from Agent Rogers by the government

on re-direct examination.  One of Blakely's main defense themes was that there was never any

explicit mention of drugs during the recorded phone conversations and no witness of the actual

exchange except for the CI, who had obvious credibility issues.  On cross-examination of both

Officer Mathis and Agent Rogers, Blakely's attorney, Mr. Camp, made the point that drugs were not

mentioned explicitly in the recorded phone conversations.  The following transpired between Agent

Rogers and Mr. Camp as to the August 1st phone call:

> Q:    And there was no mention in that phone conversation on August 1, 2006, of purchasing narcotics, was there?
> A:    It was alluded to.
> Q:    Well, let's talk about what we heard.  There was no mention of drug transactions taking place in that phone conversation on August 1, 2006, was there?
> A:    To the best of my recollection, [the CI] asked Blakely if he had it ready for him, to which Blakely advised yes.
> Q:    Okay.  Well, you're reaching assumptions and speculation.  I'm asking you,

> based on that phone conversation, was there ever any mention of a drug transaction on the phone conversation?
>
> A: In that conversation narcotics or crack cocaine was never mentioned.
>
> Q: Is that a yes, there is no mention of a transaction?
>
> A: Correct.

(Trial Tr., 157:10-158:1, Mar. 31, 2008.)  The following colloquy occurred as to the August 10

phone call:

> Q: There was no mention of a drug transaction in that conversation either, was there?
>
> A: I don't recall what was exactly said on August 10th.
>
> Q: I'll hand you what's been identified as exhibit 7 for identification only.
>
> A: Yes, sir.
>
> Q: There's no mention, is there?
>
> A: No, sir.
>
> Q: In fact, do you know what a tong is, t-o-n-g?
>
> A: Tong is common slang used for a firearm.
>
> Q: So they're not even talking about drugs.  They're talking about a firearm.
>
> A: They're alluding to drugs in this conversation.
>
> Q: According to your interpretation.
>
> A: Yes, sir.

(Trial Tr., 164:17-165:6, Mar. 31, 2008.)

On re-direct examination by Assistant United States Attorney Kitchen, the following

transpired:

> Q: When you testified a few moments ago to Mr. Camp's questions about when he was saying it was referred to about the purchase of crack cocaine, on the transcript of the telephone call of August 1st, when -- that you've indicated you've listened to, when Blakely answers and says, "Hello," and [the CI] says, "Hey man, you take care of that?"  And Blakely says, "Yeah.  About what time you going to make it over this way?"  That's Blakely asking that question.  And [the CI] says, "I'll be over there in about twenty minutes."  Do you recall Blakely saying, "All right.  I got everything lined up"?
>
> A: Yes, sir.
>
> Q: Now, what did you take that to mean?
>
> A: Meaning that the ounce and a half of crack cocaine was in order and was

awaiting [the CI]'s arrival to complete that transaction.

Q:     Do you recall then, after that statement, "I got everything lined up," the confidential informant stating, "You got everything? Ten fifty; right?" And then Blakely stating, "Yeah. Ten fifty. Right." And Blakely stating, "Yeah. I'll be" -- and then the CI saying, "I'll be over there in about twenty minutes."

A:     Yes, sir.

Q:     Is that what you were referring to when you said the drug deal was being referred to?

A:     That's correct.

Q:     Now, is that talking in code, or is that talking in -- insinuating and not directly coming out and saying that I've got the one and a half ounces of crack cocaine lined up for $1,050?

A:     That's indirectly Mr. Blakely saying, I've got what you ordered. Bring the money. Come and get it.

Q:     Then on the second phone call on August 10th, when Mr. Camp stated that it appeared that they were talking about a gun, prior to that conversation, when a female answered the phone and Blakely came on the phone and said, "Hello," and [the CI] said, "Yeah, man, I got the money and everything. I'll be over there in about -- about twenty or thirty minutes," and Blakely said, "All right." Do you recall that conversation?

A:     Yes, sir, I do.

Q:     And then the confidential informant said, "You can go ahead and have dude on the way so I go -- I ain't trying to stand out in the sun, man. It's too hot, man." And Blakely said, "Yeah." And then you recall the confidential informant saying, "That's too much money. I'm going to be standing outside." And Blakely saying, "Hey, you said about twenty, thirty minutes. I'm going to call him in about fifteen minutes. That way he'll be right on his way about the time you show up." Do you recall that?

A:     Yes, sir, I do.

Q:     And what did that mean to you?

A:     Meaning that Blakely was anticipating someone to deliver the order of crack cocaine and that he was going to allow a little bit of time to pass before he placed the call for that individual to deliver the crack cocaine to complete the drug transaction.

(Trial Tr., 167:20-170:1, Mar 31, 2008.)

At this point, defense counsel objected and a bench conference ensued. Blakely's attorney

complained that Agent Rogers was simply offering his own interpretation of the phone call and asked

that the court declare a mistrial due to the supposedly prejudicial nature of the improper testimony. The court immediately denied the mistrial motion and indicated that defense counsel should have objected "a long time ago." (Trial Tr., 171:11, Mar. 31, 2008.) The court agreed that, although Agent Rogers was qualified to explain the common meaning of slang terms or street lingo that may not be familiar to the jury, his testimony regarding the phone conversations was simply his opinion about what two people using common language were discussing. He therefore sustained the objection to the extent that Agent Rogers was offering opinion testimony where no such testimony was necessary. Defense counsel then requested that, if it was not inclined to grant a mistrial, the court issue a curative instruction to the jury regarding Agent Rogers' prior improper testimony. The court declined, responding:

> Well, I can't go back and fix thirty minutes of testimony. All I can do is rule on the objection that's before me, and I have partially sustained the objection and partially denied it. I don't plan to fix it. I'll count on you to do that in closing argument, Mr. Camp.

(Trial Tr., 173:2-7, Mar 31, 2008.)

In light of this series of events, Blakely contends that the court should have granted a mistrial or, at the very least, issued a curative instruction telling the jury to disregard Agent Rogers' testimony regarding his interpretation of the phone conversations. We review a district court's denial of a motion for a mistrial for abuse of discretion. *United States v. Davis*, 514 F.3d 596, 613 (6th Cir. 2008). The same applies for a court's refusal to give a requested jury instruction. *Williams v. Eau Claire Pub. Sch.*, 397 F.3d 441, 445 (6th Cir. 2005).

Agent Rogers' testimony was likely improper. He was not a party to the conversation and

the conversation, though vague and cryptic, did not include many words or terms with which a juror would have been unfamiliar. Blakely contends that this testimony was highly prejudicial, in that it substituted Agent Rogers' interpretation of the conversations for the jury's interpretation. However, several factors cut against Blakely's position.

First, Blakely's own attorney partially opened the door when, on cross-examination, he asked Agent Rogers whether there was any mention of drugs in the phone conversations. Indeed, counsel even made the point that Agent Rogers' statement that the CI and Blakely were alluding to drugs in the conversation was "according to your interpretation." Thus, counsel made a strategic decision to emphasize that drugs were never explicitly mentioned in the conversation and that Agent Rogers' belief to the contrary was based solely on his own interpretation.

Second, as the district court correctly noted, defense counsel did not object to this line of questioning until much of the allegedly improper testimony had already come in. The failure to lodge a contemporaneous objection, standing alone, is sufficient to defeat Blakely's request for a mistrial, but the failure to lodge a contemporaneous objection does not necessarily dispose of the argument that the court should have issued a curative instruction. However, whether to issue such an instruction remains within the trial court's discretion, *Williams*, 397 F.3d at 445, and we must give due deference to the court's advantage of being present and engaged in the trial process as opposed to our role of reviewing a cold record.

It is evident from the colloquy that the court acknowledged that Agent Rogers' testimony was improper. However, issuing a curative instruction could have led the jury to believe that the prosecution knowingly and intentionally did something wrong, which does not seem to be the case.

When viewed in this light, issuing the instruction could be seen as punishing the government for defense counsel's failure to interject in a timely fashion. Though the court did not state that this was its rationale in refusing to give the instruction, that a plausible rationale exists for refusing to issue the instruction indicates to us the decision was not an abuse of discretion. *E.g. United States v. Reesor*, 10 F. App'x 297, 305-06 (6th Cir. 2001) (finding no abuse of discretion in an evidentiary ruling where there was a plausible explanation for the court's decision, even though the district court did not offer the explanation itself).

Third, even if it was error for the court to refuse to issue a corrective instruction, the error was harmless. Officer Mathis had already testified, without objection, to much of the same substance as Officer Rogers. He testified that the CI and Blakely had already discussed quantity and price in unrecorded calls and that the recorded calls were confirming price and discussing logistics. This is functionally the same as Officer Rogers' testimony. Furthermore, the CI himself testified to his interpretation of the conversations. Finally, it was perfectly acceptable for the prosecutor to urge a specific interpretation of the conversations on the jury in his closing argument. In light of these independent, proper sources of this specific interpretation of the two recorded conversations, any error in failing to cure Officer Rogers' testimony was harmless.

**B.**     **Evidence Regarding Circumstances of CI's Prior Conviction**

Another of Blakely's defense theories at trial was that he was not dealing drugs and, instead, he was only discussing the purchase of a firearm.[4] His primary support for this argument was a

---

[4]Blakely was indicted on a firearms charge (Count 3) as well as the drug charges, but the firearms charge was severed from the two drug charges on the first day of trial. The status of this firearms charge is unclear from the record.

reference by Blakely in the August 10 telephone conversation to a "tone" or a "tong," which is apparently slang for a gun.[5] Blakely's attorney, therefore, wanted to show that the CI had a past with and was familiar with firearms.

The CI had been convicted in federal court of being a felon in possession of a firearm and in state court of aggravated assault, each charge arising out of the same incident. Blakely's counsel began questioning the CI about his prior convictions, which the prosecution had already elicited on direct examination of the CI and which the CI admitted. Counsel then moved into the details of the incident underlying the convictions, at which point the government objected. The following colloquy occurred between the court, the prosecutor, and defense counsel:

|  |  |
|---|---|
| MR. KITCHEN: | I object, Your Honor, to that line of questioning. |
| THE COURT: | Well, Mr. Kitchen, the -- I'm sorry. Mr. Camp, the prior convictions are what you can ask about, not the details or the facts of those prior convictions. |
| MR. CAMP: | May we approach momentarily? |
| THE COURT: | Yes, sir. |
| MR. CAMP: (Bench conference) | It's relevant for what I'm doing, Your Honor. |
| MR. CAMP: | Your Honor, I'm aware of that. The line of questioning deals with the fact that there was communication on August the 10th related to -- as already has been established, the attempt to purchase a "tong," which has been identified by Investigator Rogers as a gun; obviously, the theory of the defense being that this defendant was more interested in purchasing guns than purchasing drugs. By showing that, obviously, he has a history of using firearms, it would go toward relevancy related to the defendant's intent concerning |

---

[5]Both the transcript of the phone conversation and Blakely's counsel refer to it as a "tong," but the CI indicated that the word is actually "tone." Neither party explains why a gun is referred to as a "tone." However, unscientific and inconclusive internet research suggests that a gun might be called a "tone" because it is the last thing one on the losing end of a gunfight will hear.

the purchase on August the 10th; thus, the reason for -- the purpose of the question related to his use of firearms in the past.

. . . .

THE COURT: If you've proven the felon in possession, haven't you proven he possessed a firearm?

MR. CAMP: I'm merely trying to point out that he used -- not just the purchase, but personal use. He's obviously buying it for himself because he's used it.

MR. KITCHEN: And I'm objecting, Your Honor. It's totally not relevant, regardless.

THE COURT: Well, it's the convictions themselves that are relevant. You can prove the felon in possession conviction. You can prove the aggravated assault conviction. And the rules limit you to that. I'm going to sustain --

MR. CAMP: May I inquire of the court, the next question might be has he, in fact, in the past used firearms.

THE COURT: That's a prior bad act. That is not impeachable material. It's got to be a conviction.

MR. CAMP: I'm asking that in relation to the reason why he was looking to purchase it. I'm not doing it for a bad act. I'm trying to establish that this defendant has at least some knowledge of and involvement in the use of firearms.

THE COURT: Well, you've got the conviction for felon in possession of a firearm. How much better than that --

MR. CAMP: I understand. All right, Your Honor.

THE COURT: -- does it get?

MR. KITCHEN: But I don't think that's a proper question.

MR. CAMP: I'm not going to ask him.

THE COURT: I've ruled in your favor.

MR. CAMP: Yes, sir. I'm not going to ask him.

(Trial Tr., 212:13-215:10.)

The district court prohibited inquiry into the facts and circumstances underlying the felon in possession and aggravated assault convictions under Federal Rule of Evidence 404(b). That Rule provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b). As with all evidentiary rulings, we review the district court's Rule 404(b) ruling for abuse of discretion. *United States v. Jenkins*, 593 F.3d 480, 484 (6th Cir. 2010) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997)).

Blakely contended at trial, and contends on appeal, that he was not seeking to introduce the facts underlying the convictions to prove action in conformity therewith, but rather for one of the permissible purposes listed in the second sentence of Rule 404(b). He does not argue precisely to which purpose the evidence would go, just that it is not to prove propensity. However, our review of the transcript indicates that counsel was, in fact, seeking to introduce the evidence to show propensity.

The court allowed Blakely to elicit that the CI had been convicted of being a felon in possession and that the CI was "obviously no stranger to firearms." (Trial Tr., 211:24, Apr. 1, 2008.) If Blakely's purpose was to establish the factual predicate necessary to argue that the CI had knowledge of firearms, such that it would be reasonable to conclude that Blakely was interacting with the CI for purposes of buying or selling a firearm rather than drugs, the fact of the felon in possession conviction was more than ample to provide that predicate. To the extent that Blakely is arguing that the additional evidence would have gone to the CI's knowledge of or familiarity with firearms, such knowledge or familiarity would have been irrelevant. His theory, as best as can ascertained, was that the object of the transaction, at least on August 10th, was a firearm, not drugs.

But the CI's familiarity with a firearm is only barely probative, if at all, of whether he wanted to buy or sell a gun, especially in light of the fact that the jury already knew of the felon-in-possession conviction and that the CI was no stranger to firearms.

Instead, the best way to characterize Blakely's argument as to the probative value of the additional information is as a propensity argument—the CI had purchased and used a firearm in the past, thus he was more likely to be doing the same on August 10. Characterizing the argument in this way is the only way that renders the information at all logically probative, and this argument is the classic propensity argument that Rule 404(b) prohibits. Accordingly, the district court properly sustained the government's objection to questioning about the details of the prior conviction under Rule 404(b).

### III.

For the reasons set forth above, we **AFFIRM** Blakely's convictions.