**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 19a0081n.06**

**No. 18-5570**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Feb 19, 2019 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| JEFFREY ISAAC, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: CLAY, McKEAGUE, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**

Defendant-Appellant Jeffrey Isaac appeals his convictions of conspiracy to distribute controlled substances, 21 U.S.C. §§ 841(a)(1), 846, and possession of a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A), arguing that he is entitled to a new trial because a law-enforcement officer who was not testifying as an expert was permitted to improperly narrate videos of controlled drug buys as they were played for the jury. Compounding the error, Isaac argues, the district court failed to give a cautionary instruction concerning the officer's interpretation of the videos. Finding no prejudicial error, we affirm.

**I.**

After Andy Osborne and his wife, April, were arrested for possession of oxycodone and interviewed by Pikeville Police Department Officer Scotty Hamilton and Detective Mitch Adkins,

they agreed to act as confidential informants to aid in Hamilton's and Adkins's investigation of suspected drug trafficking by Isaac. On June 9, 2016, Officer Hamilton and Detective Adkins equipped the Osbornes with audio and video recording equipment, conducted a "presearch" to ensure that they did not have controlled substances or contraband, and provided them with $690 to buy drugs from Isaac. At trial, a portion of the video capturing this controlled buy was played for the jury, narrated by Officer Hamilton. The video and audio captured the Osbornes entering Isaac's residence and purchasing oxycodone from Isaac and his wife, Karen.[1] Officer Hamilton identified Isaac and Karen in the video. He also confirmed at various points what was said and the meaning of certain terms or phrases. For example, Officer Hamilton explained that Isaac's statement that "Karen will take care of you" meant "Karen will take care of business, will take care of [the Osbornes] inside the residence" (R. 157, PID 513); that the request for "18 30s" meant 18 30-milligram oxycodone tablets (*id.* at PID 515); why the Osbornes received the amount of change that Isaac provided from their $690; and the meaning of "14 fives, two bars, and a football," which another customer of Isaac's had ordered (*id.* at PID 517). Officer Hamilton also testified about the pills obtained from the Osbornes after the controlled buy and their chain of custody. Isaac did not object to Officer Hamilton's testimony about the June 9 video.[2]

Officer Hamilton next explained the Osbornes' June 17 purchase of oxycodone from Isaac, which was also captured by a video that the government played at trial. Officer Hamilton again identified Isaac and explained that Andy Osborne requested 15 tablets of oxycodone from him. Officer Hamilton also told the jury that Isaac was "scratching the bills with his finger to make sure that they're not counterfeit, that they're actual bills." (*Id.* at PID 524.) Officer Hamilton then

---

[1] Karen pleaded guilty to the conspiracy charge.

[2] Isaac objected to introduction of the video on authentication grounds, and that objection was overruled.

testified that "Jeffrey went back to the top of the refrigerator where he retrieved a plastic sandwich bag, that he is commonly known to use in the prior transactions." (*Id.*) At this point, Isaac objected to Officer Hamilton's testimony, in part because "this officer narrated what was said and narrated what was happening. I think the video itself and audio from the video would be the best evidence without his interpretations." (*Id.* at PID 524-25.) The district court responded that it was "not too thrilled with [Officer Hamilton] explaining what he perceives is happening and clarifying what he believes is being heard but I do believe the tapes bear that out." (*Id.* at PID 526.)

After the bench conference, Officer Hamilton explained that he participated in the execution of the search warrant of Isaac's residence and based on this knowledge identified the areas of the residence that were being captured on video, mentioning that "a cache of hidden controlled substances" was found in Isaac's bedroom. (*Id.* at PID 526-27.) Officer Hamilton also confirmed that the video depicts Andy Osborne leaving the residence and the Osbornes driving to where they meet Officer Hamilton for debriefing.

Other evidence was admitted at trial that is not the subject of this appeal. When officers executed the search warrant, they seized hundreds of pills and several loaded firearms from Isaac's bedroom. A forensic scientist testified that the pills purchased by the Osbornes and other pills found in the residence contained controlled substances, including oxycodone.

Detective Adkins testified about three other controlled buys occurring on June 3, July 1, and July 11, 2016. As it did with Officer Hamilton, the government played portions of the audio or video recordings of those controlled buys and then paused for Detective Adkins to explain what was happening or what was being said as the Osbornes were purchasing the oxycodone.[3]

---

[3] Isaac does not argue in his appeal brief that Detective Adkins's testimony was inadmissible.

One of the informants, Andy Osborne, testified that Isaac had asked him to sell drugs for him, which Osborne agreed to. He also testified about the controlled buy of oxycodone on June 3, where he and April Osborne purchased oxycodone from Isaac's daughter, Alyssa,[4] because Isaac was not home. Osborne explained that Alyssa would receive a portion of the sale proceeds when she sold the drugs. Osborne also testified about the June 9 and June 17 videos at issue in this appeal, where he and April purchased oxycodone from Isaac and Karen. Like Officer Hamilton, Osborne testified about what can be seen and heard happening in the video of those controlled buys. Additionally, Osborne testified about the recordings made of the July 1 and July 11 controlled buys as well. Finally, Osborne explained that he had seen Isaac with a firearm on several occasions. In one instance, one of Isaac's customers approached his residence after the cutoff time of 10:00 PM; Isaac went to the porch and told the customer that "he had five seconds to get out of there or he was going to fill him full of lead." (R. 158, PID 623.) Osborne further testified that there were "firearms always in that house, . . . around where drug deals were going on." (*Id.*)

The government then recalled Detective Adkins and established his qualifications to give expert testimony about whether Isaac's possession of firearms was in furtherance of his drug-trafficking crime. After detailing his reasons, including the proximity of loaded firearms to Isaac's stash of pills, Detective Adkins opined that "the guns that were introduced into evidence, [i.e.,] the pistols that were found in and around the drugs," were possessed in furtherance of the drug-trafficking crime. (*Id.* at PID 644.)

The jury convicted Isaac of both counts. Isaac was later sentenced to 144 months' imprisonment. Isaac now appeals his convictions.

---

[4] Alyssa and her boyfriend pleaded guilty to the conspiracy charge.

## II.

On appeal, Isaac challenges only the portions of Officer Hamilton's testimony wherein he narrated and interpreted the videos of the June 9 and June 17 controlled buys. Isaac argues that Officer Hamilton's testimony about these videos was improper because it invaded the province of the jury and constituted impermissible expert testimony, and, further, that the district court should have provided a cautionary instruction about this testimony, but did not. Accordingly, he argues, he is entitled to a new trial.

We ordinarily review a district court's evidentiary rulings for abuse of discretion. *United States v. Poulsen*, 655 F.3d 492, 510 (6th Cir. 2011). However, when a party fails to object to the admission of evidence, we review for plain error. *See United States v. Smith*, 601 F.3d 530, 538 (6th Cir. 2010) (citing *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007)). Similarly, where, as here, a party does not "request a cautionary instruction or object to the instructions issued to the jury," we review the district court's failure to provide a cautionary instruction for plain error. *Eid v. Saint-Gobain Abrasives, Inc.*, 377 F. App'x 438, 441 (6th Cir. 2010). Plain error is (1) error that is (2) plain (i.e., "clear or obvious"), (3) results in actual prejudice "affect[ing] the appellant's substantial rights," and (4) "seriously affects[s] the fairness, integrity, or public reputation of the proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (second alteration in original) (internal quotation marks and citations omitted).

We have previously explained that an officer witness who has not been qualified as an expert may interpret what is said during recorded transactions "only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred." *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015) (quoting *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001)).

This rule is derived from Rule 701, which states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

> The party offering testimony under Rule 701 must establish that all three requirements are satisfied. [*United States v.*] *Freeman*, 730 F.3d [590,] 595–96 [(6th Cir. 2013)]. The function of lay opinion testimony is to "describ[e] something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." *Id.* at 595 (quoting *United States v. Jayyousi*, 657 F.3d 1085, 1120 (11th Cir. 2011) (Barkett, J., concurring in part and dissenting in part)); *see also United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005) (describing lay opinion testimony as an acceptable shorthand for the rendition of facts the witness personally perceived).

*Id.* at 379 (fourth alteration in original).

Isaac does not argue about any specific statements made by Officer Hamilton. The general categories of potentially problematic testimony can be divided as follows:

*Identification.* Officer Hamilton identified the informants as well as Isaac and Karen.

*Drug terms.* Officer Hamilton testified about the meaning of certain terms, indicating they referred to drugs. (*See, e.g.*, R. 157, PID 515 ("30s" means "30 milligram oxycodone tablets"); *id.* at PID 517 ("14 fives, two bars, and a football").)

*Money exchanged.* Officer Hamilton explained the change that was requested for the June 9 transaction, noting that the Osbornes were given $6 back from the $690 provided to Karen because each 30-milligram tablet of oxycodone cost $18.

*Plain English.* Officer Hamilton sometimes interpreted plain English and explained ordinary events that the jury could perceive for itself. (*See, e.g.*, *id.* at PID 513 (testifying that "Karen will take care of you" meant that Isaac's "wife, Karen, will take of business, will take care of them inside the residence").)

We need not decide whether portions of Officer Hamilton's testimony were inadmissible or whether the district court erred by failing to provide a cautionary instruction because a new trial is not warranted if the admission of the testimony amounted merely to harmless error. We deem errors to be harmless where "the record evidence of guilt is overwhelming, eliminating any fair assurance that the conviction was substantially swayed by the error." *United States v. LaVictor*, 848 F.3d 428, 448 (6th Cir. 2017) (internal quotation mark omitted) (quoting *United States v. Hardy*, 643 F.3d 143, 153 (6th Cir. 2011)), *cert. denied*, 137 S. Ct. 2231 (2017).

For the conspiracy count, the government had to prove "the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and participated in the conspiracy." *United States v. Volkman*, 797 F.3d 377, 390 (6th Cir. 2015) (internal quotation mark omitted) (quoting *United States v. Conrad*, 507 F.3d 424, 432 (6th Cir. 2007)). For the count of possession of a firearm in furtherance of a drug-trafficking crime, the government had to prove that Isaac possessed a firearm, "a 'specific nexus between the gun and the crime charged[,]' and that the firearm 'was strategically located so that it is quickly and easily available for use.'" *United States v. Ham*, 628 F.3d 801, 808 (6th Cir. 2011) (quoting *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001)).

Here, the evidence against Isaac was overwhelming, eliminating any possibility that the conviction was substantially swayed by any error. The government presented evidence that hundreds of pills and several loaded firearms in close proximity to the pills were seized from

Isaac's bedroom after a search of his residence; video and audio recordings of several controlled buys were introduced, including three that are not at issue in this appeal; a forensic expert testified that the pills contained controlled substances; one of the informants testified that Isaac enlisted him to sell oxycodone and that Isaac routinely had firearms while dealing drugs; and an expert witness opined that Isaac possessed the firearms in furtherance of his drug trafficking based on the location and type of firearms seized, as well as the fact that several of them were loaded. Thus, even putting aside the challenged testimony, which had nothing to do with whether Isaac's possession of firearms was in furtherance of the drug-trafficking crime, the evidence was overwhelming that Isaac conspired to violate the drug laws with Karen, Alyssa, and/or Andy Osborne, and possessed firearms in furtherance of a drug-trafficking crime. *See, e.g.*, *United States v. Williamson*, 656 F. App'x 175, 188 (6th Cir. 2016) ("[T]he overwhelming amount of other evidence about this particular incident—the contemporaneous video surveillance showing the movements of Williamson; the cocaine seized from Sheppard; the testimony from co-conspirators and other police officers involved in the arrest—conclusively tied Williamson to this particular cocaine deal, and to the drug trafficking enterprise as a whole." (citation omitted)); *United States v. Martin*, 520 F.3d 656, 660 (6th Cir. 2008) (finding that allowing an officer to testify as an expert and fact witness without a cautionary instruction was not plain error where evidence of guilt was overwhelming).

Further, Andy Osborne testified about the videos at issue on appeal and addressed the same pertinent points as Officer Hamilton. For the June 9 transaction, Osborne identified himself, April Osborne, Isaac, and Karen; he explained that Isaac told him that Karen would handle the oxycodone transaction; he explained that other customers were coming to Isaac's residence to buy drugs; and he pointed out when he received the drugs and the $6 in change after giving Karen the

buy money. For the June 17 transaction, Osborne testified that the plan was for him to purchase 15 oxycodone 30-milligram tablets and that he was provided $600 in buy money to do so; he identified where he asked Isaac for 15 oxycodone pills; he explained that Isaac, as he always did, scratched the bills to ensure they were not counterfeit; and he explained that Isaac went to the bedroom to get the oxycodone and then gave the oxycodone to him. Because the informant who participated in the transactions—and whose testimony about those transactions is not at issue on appeal—testified to the same critical facts as Officer Hamilton, any error in admitting Officer Hamilton's testimony was harmless. *See United States v. Blakely*, 375 F. App'x 565, 571 (6th Cir. 2010) (finding harmless error where "much of the same substance" of the disputed testimony was introduced through another witness).

Finally, Isaac does not point to a single statement made by Officer Hamilton that either offered an erroneous interpretation of the video or could have substantially swayed the jury. *See Kilpatrick*, 798 F.3d at 383 ("[D]efendants who challenge a lay witness's identification testimony on appeal should state some claim that the identification was faulty or debatable, and show how the answer was prejudicial." (citation omitted)). Under these circumstances, any error was harmless.

**III.**

For the reasons set out above, we affirm.