**NOT RECOMMENDED FOR PUBLICATION**
File Name: 09a0226n.06
Filed: March 24, 2009

Nos. 07-5922/07-6217

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| Jose Felix Delgadillo and Mario Compean, | ) | WESTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

**BEFORE:** Merritt, Cole, and Sutton, Circuit Judges.

**MERRITT, Circuit Judge.** This appeal arises from the jury convictions of defendants Mario Compean and Jose Delgadillo for drug offenses stemming from a cocaine conspiracy in Louisville, Kentucky. Most of the issues on appeal — the sufficiency of the evidence, prosecutorial misconduct, including the failure to turn over exculpatory evidence, and the amount of cocaine attributable to members of the conspiracy — are primarily factual in nature and are an attack on the main government witness in the case, Fred Harris, a drug dealer turned government informant whose testimony was the basis of the government's case. The assignments of error are attempts to undermine the testimony of Harris, which the jury obviously accepted when it returned its guilty verdicts.

Police arrested Fred Harris in Louisville, Kentucky, on March 21, 2006. After his arrest, Harris agreed to cooperate with the Drug Enforcement Administration by identifying other dealers or drug rings in Louisville from which he had purchased drugs. Harris told authorities that he had purchased cocaine from two different sources: the Marin drug ring, which was the source from which he was attempting to purchase drugs when he was arrested, and from a defendant in this case, Mario Compean. Harris testified that he had been purchasing cocaine from both sources for a year and one-half at the time of his arrest.

Acting as an informant, Harris began secretly recording his conversations with defendant Compean. Harris and Compean made arrangements for a deal on March 29, 2006. Compean told Harris to meet him at the same place where they had done several previous drug deals. Harris arrived at the designated place and defendants Compean and Delgadillo were there. Gonzalez-Bautista, whom Harris identified as the man who generally drove the car carrying drugs for Compean, arrived shortly thereafter. Law enforcement agents arrived and arrested Compean, Delgadillo and Gonzalez-Bautista. A drug dog alerted on the car Gonzalez-Bautista had been driving and the agents found 25.09 kilos of cocaine in hidden compartments.

At trial, Harris testified about three previous deals he had done with Compean. The first, in the summer of 2005, was arranged with someone Harris knew as "Rafael." Rafael, Compean and Gonzalez-Bautista were present on that occasion and Harris testified that he bought 50 kilos of cocaine. The second was a month later. Harris testified he had received another delivery of cocaine after negotiating with Rafael. Again, Compean and Gonzalez-Bautista were present and the cocaine was stashed in hidden compartments in the car. Harris testified that he bought 35 kilos that time.

Then in the third deal in early 2006, Compean and "some other guy" found Harris at the location where Harris had purchased the two prior deliveries of cocaine from Rafael and Compean. Compean was able to contact Harris, who testified that Compean, Delgadillo and Gonzalez-Bautista delivered 30 kilos of cocaine to him at the same location as before.

It was after the third deal that Harris was arrested during a drug transaction related to a different conspiracy. When Harris first started cooperating with law enforcement, he told them about his dealings with Compean. Harris did not tell the authorities at that time that he had hidden about 15 kilos of cocaine from the last delivery from Compean. Several days later, Harris told a family member about the hidden cocaine, and Harris' lawyer advised the government where it was. When agents went to the location, they found 14.95 kilos of cocaine. Harris testified that he did not originally tell agents about the hidden cocaine because he was scared and thought he would get in more trouble.

Compean, Delgadillo and Gonzalez-Bautista were charged with conspiracy to possess and distribute cocaine in violation of 21 U.S.C. § 846 (Count 1) and aiding and abetting possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (Count 2) and a forfeiture claim (Count 3). Gonzalez-Bautista pled guilty, but Compean and Delgadillo went to trial where they both testified that they had no involvement in a drug conspiracy. The jury convicted both men on the conspiracy charge, but acquitted Delgadillo of the possession with intent to distribute count. Compean was sentenced to 235 months and Delgadillo was sentenced to 188 months. Both men appeal their convictions, but only Compean appeals his sentence.

## I. Sufficiency of the Evidence

Delgadillo challenges the sufficiency of the evidence supporting his conspiracy conviction. The question on appeal is whether after reviewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the claim. The elements that must be proved to sustain a conviction of conspiracy under 21 U.S.C. § 846 are: (1) the existence of an agreement to violate the drug laws; (2) defendant must know of the conspiracy; and (3) defendant intended to join and participate in the conspiracy.

Delgadillo contends that there were no recordings of him discussing the sale or distribution of cocaine and that he was not present at all of the drug deals with Compean described by Harris at trial. This argument overlooks the fact that evidence supporting his conviction includes: (1) a videotape of Delgadillo at the garage on March 29, 2006, at the time of his arrest where drugs were found in the car; (2) the testimony of Harris that he talked to Delgadillo on the phone at least once about a drug deal because Delgadillo spoke English better than Compean, and (3) Harris' testimony that Delgadillo was present during at least one prior drug transaction Harris did with Compean in early 2006. Harris also described how Delgadillo helped to unload 30 kilos of cocaine from the car and put cash into the hidden compartments. In addition, there is testimony in the record by Gonzalez-Bautista, Compean's driver who pled guilty and testified, that Delgadillo was present at the early 2006 transaction, which corroborates Harris' testimony about Delgadillo's presence at the early 2006 transaction.

Delgadillo dismisses this evidence, claiming that Harris' testimony about his involvement is not credible and that his "mere presence" at the scene on the day of his arrest does not mean he is part of a conspiracy. But the testimony gives rise to a strong inference that Delgadillo was present

-4-

with a purpose. Harris and Gonzalez-Bautista testified concerning his involvement in at least one of the earlier transactions, and it was for the jury to judge their credibility.

Delgadillo also argues that his conspiracy conviction cannot be reconciled with the jury's acquittal of the substantive charge of possession with intent to distribute. There are a number of ways the verdicts may be regarded as consistent: it is possible, for example, that because the drug deal where Delgadillo was arrested was never completed the jury could not find evidence that Delgadillo actually possessed and intended to distribute cocaine. *See also United States v. Powell,* 469 U.S. 57, 62-63 (1984) (inconsistent and compromise verdicts permitted).

## II. Prosecutorial Misconduct

Both Delgadillo and Compean contend that the prosecutor improperly vouched for or bolstered the testimony of government witness Fred Harris. Specifically, Delgadillo claims that the prosecutor indicated a personal belief in Harris' credibility through her questioning of Harris on redirect, thereby placing the prestige of the United States behind him. Delgadillo's counsel objected at trial and the objections were overruled. Similarly, Compean argues that statements made by the prosecutor during her closing argument (1) referred to the government's version of the facts as "the truth," thereby placing the prestige of the United States behind Harris' testimony, (2) improperly bolstered Harris by telling the jury that his version of the facts were "the truth," and (3) inflamed the jury by referring to defendants as "outsiders" from Chicago bringing drugs into the community. Compean's counsel did not raise any objection to the prosecutor's closing argument, so this court reviews those comments for plain error.

Compean cites the following portion of the prosecutor's closing argument to show impropriety:

> [A]t the beginning of this case I told you what the true facts of the case would be. And at the end of this case, after you've heard all the evidence, that is in fact what the true facts of the case are. . . . [The defense] want[s] to divert your attention from the truth – from the truth, from the real facts of the case.

Compean also objects to statements by the prosecutor during closing that "Harris told you the truth about what these defendants did," and "Harris could do all these things [recite details about his deals with defendants] because he is telling the truth."

These various statements by the prosecutor about Harris were intended to counter the fact that the defense had repeatedly characterized Harris as a liar, a felon and a drug dealer and repeatedly told the jury that he was only testifying to curry favor with the government and save himself from a long prison term. The government is entitled to fight hard against statements by defense counsel that Harris was lying and that only the defendants were telling the truth. We find no reversible error in the government's use of the same language in response to similar defense language. The government was countering defendants' testimony that they were not involved in the conspiracy. Unlike many cases where defendants do not testify and the government tells its story in a largely undisputed manner, Delgadillo and Compean testified in their own defense, so the government was trying to counter defendants' version of the facts by defending its star witness' truthfulness and credibility. Sometimes these cases become a shouting contest about who is telling the "truth." Since jury trials are a search for the truth, these kinds of controversies are frequent. The defense cannot have it both ways. We find no plain error in the prosecution's invocation of truth.

The same reasoning applies to Delgadillo's objections to questions posed by the prosecutor

to Harris during redirect:

Q. Have I ever told you what the United States' recommendation would be regarding

how long you would go to prison?

A. No.

Q. . . . What have I told you about the recommendation as to whether you would or

wouldn't go?

A. I tell the truth.

. . .

Q. Mr. Harris, have I ever told you that I would recommend that you not go to prison?

A. No, ma'am.

Q. And, in fact, what did I say about whether or not you would go?

. . .

Q. . . . [H]ave I ever told you that you would not go to prison?

A. No.

*   *   *

Also as a part of its government misconduct claim, Delgadillo appeals the district court's

refusal to force the government to disclose reports law enforcement agents prepared of informant

Harris' communications with the authorities concerning his dealings with members of the instant

conspiracy, as well as with other drug dealers.[1]  Delgadillo contends that the government was required to disclose such documents pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), the Jencks Act, 18 U.S.C. § 3500 or *Giglio v. United States*, 405 U.S. 150, 154 (1972).[2]  A fundamental problem with this claim is that the record is unclear concerning what documents the government turned over to defense counsel.[3]

There is no dispute that the government turned over Harris' plea agreement and criminal arrest records, but whether other documents were also turned over is unclear from the record.  The district court reviewed certain Harris documents *in camera* during trial and ruled at that time that the government was not required to turn them over, but stated that the documents would be sealed and put in the record to be reviewed by the appellate court.  The Joint Appendix and other documents filed with this Court, however, did not contain any sealed documents.  We made a request for any sealed documents from the district court proceeding below and received seven documents, all of which were "Report of Investigation" forms (Drug Enforcement Administration Form 6) concerning law enforcement's communications with two unnamed confidential sources.

---

[1]Although defendant Compean joined in the Motion to Compel disclosure of these documents at trial, he did not raise this issue on appeal.

[2]At the district court, Delgadillo also sought disclosure of these documents pursuant to Federal Rule of Evidence 608, which concerns the admissibility of specific instances of conduct of a witness.  As there is no mention of Federal Rule 608 in his opening appeal brief, we will consider the issue waived on appeal.

[3]The panel attempted at oral argument to clarify the record below with counsel, but none of the lawyers arguing on appeal for either defendants or the government had served as trial counsel.  As such, they were unable to answer the panel's questions concerning what documents, if any, were turned over to the defense at or prior to trial.

We have reviewed the seven documents filed under seal that we received: six documents prepared by Agent Bester, who testified, and one document prepared by Agent Perryman, who did not. Six of the seven documents document recorded conversations between a confidential source in the unrelated conspiracy and various participants in the unrelated conspiracy, including Harris. Harris is mentioned in each one of the documents as a person who bought cocaine or arranged to buy cocaine from the confidential source. Two of the reports mention specific quantities that Harris sought to purchase from the confidential informant in the unrelated conspiracy: 13 kilos (9/20/05 report) and 5 kilos (2/6/06 report and the arrest report of 3/23/06). The documents are dated between 9/2/05 and 3/23/06 and were prepared and signed by Special Agent Brian Bester.

Despite the contentions of Delgadillo in his appeal brief that no documents were received, it appears from the transcript of the sentencing hearing that some documents, possibly these six, were in fact turned over to the defense before Agent Bester testified:

> **The trial court**: You were given Bester's [reports] . . . on the morning of trial.
> **Counsel for Delgadillo**: Yes, we were. . . . I'm not sure if we received all of it – all of his [Bester's] reports.

Joint Appendix at 514-15 (Transcript of Sentencing Hearing). After more discussion, the district court says:

> The government did turn over what it had. I ruled on Harris, but there were no – on the DEA statements, but there were no statements by [Agent] Sanders, [Informant] Harris, [Agent] Perryman did not testify and they [the defense] got [Bester's] statement. The rulings on the DEA 6s [the forms prepared by the agents] are on the [trial] record and the DEA 6s themselves are sealed as part of the record for a reviewing court to consider.

J.A. at 516. From this testimony at the sentencing hearing, we gather that before Agent Bester testified at trial, some documents prepared by Bester were turned over to defendants. For its part, the government represented at the sentencing hearing that it had turned over all the documents prepared by Agent Bester, who testified at trial.

The seventh document filed under seal and received by the panel is also a Drug Enforcement Administration Form 6, dated 4/11/06, but instead of being signed by Agent Bester as the other six were, it is signed by Agent Thomas Perryman, who did not testify at trial. It concerns recorded conversations by a confidential source (presumably Harris) relating to the instant conspiracy. It is not clear if it was turned over. A review of the document's contents show that it would not have been exculpatory to Delgadillo. Delgadillo's name is not mentioned in the report by Agent Perryman recording Perryman's interview with Harris concerning the Compean conspiracy. The report mentions only "Mario" by name (presumably defendant Mario Compean) and mentions the existence of two accomplices without naming them. Unfortunately for Delgadillo, the report supports Harris' testimony at trial when he states that Compean was usually accompanied at the drug sales by two other men: a driver and someone else who could speak English better than Compean. Harris testified that he spoke to Delgadillo on the phone once because Delgadillo's English was better than Compean's. The only significant discrepancy between Harris' statements in the report and his testimony go to drug quantities. The report does not mention the 15 kilograms Harris hid before he was arrested. The report also states that Harris told Agent Perryman that he made about 6 buys from Compean, each about 30 kilograms, but at trial he testified that he made four buys from Compean, each about 50 kilograms. Had Delgadillo had the benefit of Perryman's report of his interview with

Harris, it would not have exonerated Delgadillo.  Error, if any, in failing to disclose the document was harmless.

### III. Sentencing

Only defendant Mario Compean appeals his sentence.  He is a first offender of a nonviolent crime and received a sentence of 20 years less five months.  Compean had a base offense level of 38 and a criminal history category of I, resulting in a sentencing range under the guidelines of 235-290 months with a mandatory minimum of 10 years under 21 U.S.C. § 841(b)(1)(A).  The district court sentenced him to 235 months.  Compean challenges his sentence on several grounds, including that it is unreasonable.  We agree that the sentence is unreasonable.

Compean challenges his sentence as "unreasonable" because the district judge did not consider the § 3553(a) factors in imposing the sentence.  The district judge just briefly mentioned § 3553(a), noted the large amount of cocaine involved and its effect on the community and said that the sentence is "sufficient but not greater than necessary" to comply with the purpose of § 3553(a).  J.A. at 554.  Beyond that brief paragraph, nothing else is mentioned.  Compean informed the judge that he is the father and provider of three, one of whom is ill and needs heart surgery.  He is also responsible for his aging mother.  He has a good work history and has not been in trouble with the law before.  None of this was mentioned by the court in sentencing.  No reason is given for a 20-year sentence of a first offender of a nonviolent crime.  On that basis alone, the sentence is unreasonable and is remanded to the district court for further detailed consideration of the § 3553(a) factors, including rehabilitation and why the mandatory minimum sentence of 10 years is not a sufficient punishment for this crime.  *See United States v. Thomas*, 498 F.3d 336, 341 (6th Cir. 2007).

For the foregoing reasons, we affirm the conviction and judgment of the defendant Delgadillo and the conviction of Compean but reverse the sentence of Compean and remand his case for resentencing.