**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name:  12a0739n.06**

**Nos. 11-5154, 11-5145**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
*Jul 10, 2012*
LEONARD GREEN, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) ON APPEAL FROM THE |
| KEMAL DUGALIC, | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE EASTERN |
| Defendant-Appellant, and | ) DISTRICT OF KENTUCKY |
| | ) |
| DONTA HAMILTON, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

BEFORE:  MOORE, ROGERS, and GRIFFIN, Circuit Judges.

ROGERS, Circuit Judge.  A jury convicted Kemal Dugalic of conspiring to distribute cocaine, conspiring to distribute marijuana, and conspiring to launder drug proceeds.  The same jury also convicted Dugalic's co-defendant, Donta Hamilton, of conspiring to distribute cocaine.

Dugalic now appeals his conviction and sentence and claims that (1) the district court erred in admitting certain testimony, (2) there was a fatal variance between the indictment and the evidence introduced at trial, (3) there was insufficient evidence to convict him of conspiring to commit money laundering, (4) there was insufficient evidence to convict him of conspiring to distribute more than 100 kilograms of marijuana, (5) the district court violated his Sixth Amendment right to a public trial, (6) the district court abused its discretion by refusing to conduct an in camera review of potential *Brady* material, and (7) his sentence was substantively unreasonable.

Hamilton appeals only his sentence and argues that the district court erred by (1) not decreasing his offense level for acceptance of responsibility, (2) not decreasing his offense level for being a minor or minimal participant in the criminal activity, and (3) enhancing his offense level because he possessed a dangerous weapon.

Each of these claims lacks merit.

I.

In early 2008, the Drug Enforcement Administration (DEA) began investigating possible drug trafficking near London, Kentucky. Through its investigation, DEA agents met Jimmy Jones, who admitted that he regularly purchased several ounces of cocaine from Kemal Dugalic and distributed it to others. Jones also told the agents that, on one occasion, he saw Dugalic in possession of one kilogram of cocaine. Jones agreed to cooperate with the DEA in its investigation.

The DEA had Jones make several controlled drug purchases from Dugalic while wearing a hidden recording device. On one occasion, Dugalic told Jones that his cocaine supplier was a Bosnian man with ties to a Mexican drug cartel. Dugalic also told Jones that his supplier moved approximately 200 kilograms of cocaine per month, transported the drugs by using multiple vehicles with hidden compartments, and made thousands of dollars.

In an effort to further its investigation, the DEA conducted extensive surveillance, interviewed many cooperating witnesses, and initiated numerous wiretaps. The DEA also intercepted hundreds of relevant phone calls, several of which involved discussions of criminal activity.

Ultimately, the DEA uncovered a large-scale international drug trafficking organization in which a source with direct ties to a major Mexican drug cartel regularly brought large quantities of cocaine from Mexico into the United States and delivered it to Emir Dadanovic, a Bosnian man based in Indianapolis. Dadanovic then directed his subordinates, including Dugalic and others, to deliver multiple kilogram quantities of cocaine to various regional distributors in Tennessee, Kentucky, West Virginia, Pennsylvania, Ohio, and Illinois. Dadanovic had drivers, including Halil Batlak, assist with these deliveries. The regional distributors, including Donta Hamilton, then distributed the cocaine at the local level. Based on its investigation, the DEA believed that Dadanovic's organization was responsible for distributing hundreds of kilograms of cocaine.

The DEA also learned that members of Dadanovic's organization were involved in distributing marijuana. During its investigation, DEA agents recorded several conversations in which Dugalic and others discussed marijuana transactions, including transactions involving Jerdin Yanes. The DEA also learned that Batlak repeatedly delivered marijuana, including 500 pounds for Yanes, and that Dugalic himself received marijuana from Yanes. Based on its investigation, the DEA believed that Dadanovic's organization was responsible for delivering over 100 kilograms of marijuana.

Eventually, in October 2009, law enforcement officials arrested several individuals involved in Dadanovic's organization, including Dugalic and Hamilton. In conjunction with these arrests, the DEA seized six kilograms of cocaine, drug paraphernalia, drug ledgers, firearms, and tens of thousands of dollars in cash.

In March 2010, a federal grand jury indicted thirteen individuals, including Dugalic and Hamilton. The grand jury charged Dugalic with conspiring to distribute cocaine, conspiring to distribute marijuana, and conspiring to launder drug proceeds. The grand jury charged Hamilton with conspiring to distribute cocaine. While some of their co-defendants took plea deals, Dugalic, Hamilton, and three others proceeded to trial.

At trial, the Government put on over 40 witnesses, introduced dozens of pieces of evidence, and played over two hundred taped phone calls. Among the Government's many witnesses was DEA Agent Jerel Hughes, who testified about the meaning of certain code words used by members of Dadanovic's organization, and Batlak, who described his role as a driver in Dadanovic's organization. During the trial, the defense asked the district court to conduct an in camera review of notes from a police interview with Batlak to determine if redacted portions of those notes contained *Brady* material. The district court, however, declined the defense's request, relying on the prosecutor's statement that he had reviewed the notes in question and provided the defense with all *Brady* material.

After all of the evidence was presented, the district court read the jury instructions. The district court then told the parties and the public that closing arguments would begin the following morning at "8:00 sharp" and that, after that time, the courtroom doors would be locked so as to prevent distractions from "anyone coming in and out." The district court followed its stated procedure and the parties presented their closing arguments without objecting to the lack of distractions. The case was then submitted to the jury.

The jury found Dugalic and Hamilton guilty on all of the counts with which they were charged. Dugalic then filed a motion for a judgment of acquittal or new trial, arguing that there was insufficient evidence to support the jury's findings that he conspired to distribute marijuana and conspired to launder drug proceeds. The district court, however, denied Dugalic's motion, holding that a reasonable jury could have found that Dugalic committed these crimes.

Dugalic's Presentence Report (PSR) recommended a total offense level of 43 and a criminal history category of I based on zero criminal history points, resulting in a recommended guidelines range of life imprisonment. At Dugalic's sentencing hearing, however, the district court found that Dugalic was not a manager or supervisor in the money laundering activity and, therefore, the proper guidelines range was 324 to 405 months' imprisonment. The district court then considered the § 3553(a) factors in order to fashion a sentence that was "sufficient but not greater than necessary to comply with the purposes of . . . Section 3553(a)." The district court discussed, at length, the nature and circumstances of the offenses; Dugalic's history and characteristics; the need for the sentence imposed to reflect the seriousness of the offenses, to promote respect for the law, to provide just punishment, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of Dugalic, and to provide Dugalic with needed treatment; and the need to avoid unwarranted sentence disparities. The district court then sentenced Dugalic to a total of 365 months' imprisonment.

Hamilton's PSR recommended a total offense level of 34 and a criminal history category of II based on three criminal history points, resulting in a recommended guidelines range of 168 to 210 months' imprisonment. Hamilton, however, asserted three objections to his PSR. First, Hamilton

argued that the probation officer should have reduced his offense level by two levels because he clearly demonstrated acceptance of responsibility for his offense. Hamilton argued that he only went to trial to assert a legal defense—that he was not involved in the precise conspiracy alleged by the Government—and that he never denied that he engaged in criminal conduct. Second, Hamilton argued that the probation officer should have reduced his offense level because he was merely a minor or minimal participant in the criminal activity. Third, Hamilton argued that the probation officer should not have applied a two-offense-level enhancement for possessing a firearm because his firearms "had nothing to do with this offense whatsoever."

At Hamilton's sentencing hearing, the district court began by overruling Hamilton's objections to his PSR. First, the district court determined that Hamilton was not entitled to a two-point offense level reduction for acceptance of responsibility because he went to trial to make a factual challenge to the Government's proof. Second, the district court found that Hamilton was not entitled to a mitigating role reduction because he was only held accountable for the quantity of drugs attributable to him and, in any event, was not substantially less culpable than his co-defendants. Third, the district court found that Hamilton's offense level was properly enhanced because DEA agents seized multiple guns from Hamilton's residence and those guns were located within five feet of marijuana. The district court then thoroughly considered the various § 3553(a) factors and sentenced Hamilton to 168 months' imprisonment.

Both Dugalic and Hamilton now appeal.

II.

A. Dugalic's Appeal

On appeal, Dugalic argues that (1) the district court erred in admitting certain testimony, (2) there was a fatal variance between the indictment and the evidence introduced at trial, (3) there was insufficient evidence to convict him of conspiring to commit money laundering, (4) there was insufficient evidence to convict him of conspiring to distribute more than 100 kilograms of marijuana, (5) the district court violated his Sixth Amendment right to a public trial, (6) the district court abused its discretion by refusing to conduct an in camera review of potential *Brady* material, and (7) his sentence was substantively unreasonable. All of Dugalic's claims lack merit.

1.

Dugalic first argues that the district court erred in allowing Agent Hughes to testify about the meaning of certain code words used by members of Dadanovic's organization.[1] On direct examination, Agent Hughes testified about the DEA's investigation, as well as his opinion that drug dealers often use code words to disguise their dealings. Then, on cross-examination, one of Dugalic's co-defendants repeatedly asked Agent Hughes what code words were used in this case, and Agent Hughes responded that members of Dugalic's organization referred to money as "wheat," marijuana as "green," and cocaine as "material."

The district court did not abuse its discretion in admitting Agent Hughes's answers. Agent Hughes's testimony helped the jury understand the meaning of the defendants' coded conversations,

---

[1] Dugalic mistakenly challenges Officer Ryan Bartlett's testimony, even though Officer Bartlett did not testify about the meaning of any code words.

and the district court gave an appropriate cautionary instruction so that the jury could give proper weight to this testimony. This court has repeatedly recognized that, in drug cases, officers can testify as to the meaning of code words. *See United States v. Fontao*, 83 F.3d 423, 1996 WL 189306, *4 (6th Cir. 1996) (table); *United States v. Garcia*, 72 F.3d 130, 1995 WL 712757, *5 (6th Cir. 1995) (table). In particular, we have held that a district court did not abuse its discretion by allowing an FBI agent to testify "as to the words or jargon used in the intercepted conversations." *United States v. Webber*, 259 F. App'x 796, 802 (6th Cir. 2008). Similarly, the district court did not abuse its discretion in admitting Agent Hughes's testimony.

Dugalic's citation of *United States v. Blakely*, 375 F. App'x 565 (6th Cir. 2010), does not advance his argument. It is true that, in *Blakely*, this court stated that it was "likely improper" when a federal agent offered his own interpretation of a vague phone call that "did not include many words or terms with which a juror would have been unfamiliar," although we ultimately held that any error in this regard was harmless. *Blakely*, 375 F. App'x at 570-71. In this case, Agent Hughes was not simply offering his own interpretation of a phone call; rather, he was testifying about specific code words used in the drug trade. Accordingly, Dugalic's reliance on *Blakely* is misplaced.

Dugalic's suggestion that Agent Hughes was not qualified to testify as an expert is likewise without merit. Agent Hughes was a special agent with the DEA for over ten years, had prior law enforcement experience as a Border Patrol agent and with the Coast Guard, participated in "hundreds, if not thousands" of drug cases, including cases involving marijuana and cocaine, was familiar with the use of wiretaps, and had specialized training in several areas, including drug identification and the clandestine production of drugs. Clearly, Agent Hughes was qualified to

testify about the meaning of code words used in the drug trade. And the fact that many of the defendants' conversations were initially in Bosnian or Serbian is immaterial because there is no dispute that those conversations were properly translated. In short, Dugalic's argument that the district court erred in admitting Agent Hughes's testimony is unavailing.

2.

Dugalic next argues that there was a fatal variance between the indictment and the evidence introduced at trial because, although the indictment alleges that he and several other people were all involved in a single conspiracy to distribute cocaine, the proof at trial actually demonstrated multiple conspiracies. However, when viewed in the light most favorable to the Government, the evidence supported a finding of a single conspiracy to distribute cocaine.

The Government's proof revealed a "chain conspiracy" with Dadanovic running the show from Indianapolis. Once Dadanovic received cocaine from Mexico, he directed his subordinates, including Dugalic and others, to deliver the cocaine to various regional distributors in Tennessee, Kentucky, West Virginia, Pennsylvania, Ohio, and Illinois. Dadanovic's drivers assisted with these deliveries. The regional distributors then distributed the cocaine at the local level. Through this hierarchy, Dadanovic's organization distributed hundreds of kilograms of cocaine and handled millions of dollars.

Dugalic argues that this was not a single enterprise, but rather multiple, smaller enterprises. To support his argument, Dugalic claims that "there was significant evidence" that his brother and co-defendant, Omer, "had a separate organization" in Pittsburgh, with his own purchasers and delivery men. Dugalic, however, cites none of this "significant evidence" and ignores the

Government's evidence that he discussed possible cocaine transactions with Omer. Moreover, in order to prove a single conspiracy, the Government need not show that each member of the conspiracy knows of, or is involved in all of, the activities that comprise the conspiracy. *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982). Instead, all that is required is that each conspirator "'agreed to participate in what he knew to be a collective venture directed toward a common goal.'" *Id.* (quoting *United States v. Martino*, 664 F.2d 860, 876 (2d Cir. 1981)).

There was ample evidence that Dugalic agreed to participate in what he knew to be a large-scale international drug trafficking organization led by Dadanovic and directed toward the goal of making money to continue the tiered enterprise. Dugalic told the Government's cooperating witness, Jones, that his cocaine supplier was a Bosnian man with ties to a Mexican drug cartel, moved approximately 200 kilograms of cocaine per month, transported the drugs by using multiple vehicles with hidden compartments, and made thousands of dollars. Dugalic then sold cocaine to Jones and repeatedly met and spoke with Dadanovic, Hamilton, Yanes, Batlak, and others about other cocaine transactions. While Dugalic may not have known every member of Dadanovic's organization, and may not have been aware of all of the organization's activities, there was certainly sufficient evidence from which the jury could find a single conspiracy. In other words, we cannot say that the evidence "can reasonably be construed *only* as supporting a finding of multiple conspiracies." *Warner*, 690 F.2d at 548 (emphasis added).

Dugalic cites *United States v. Swafford*, 512 F.3d 833 (6th Cir. 2008), but that case is distinguishable. In *Swafford*, the Government attempted to prove a "wheel conspiracy," with Swafford acting as the hub, connected to various customers by spokes. *Swafford*, 512 F.3d at 842.

The Government, however, failed to prove the existence of a common goal or enterprise, and, therefore, we found a "rimless wheel conspiracy," with Swafford engaging in multiple conspiracies with individual customers. *Id.* That situation created a fatal variance from the indictment, which charged a single conspiracy. *Id.* at 842-44. Notably, however, we stated in a footnote: "this is not a 'chain conspiracy' where the existence of a single conspiracy is proved by the fact that operators at different levels are connected by a common scheme or enterprise." *Id.* at 842 n. 3. Here, the jury heard clear evidence of a "chain conspiracy," with Dadanovic at the top, Dugalic and others below him, and the regional distributors further down the chain. Accordingly, Dugalic's reliance on *Swafford* is misplaced and his argument that there was a variance between the indictment and the evidence at trial is without merit.

3.

Dugalic next challenges the sufficiency of the evidence supporting the jury's finding that he conspired to commit money laundering. Count 4 of the indictment alleged that Dugalic and others conspired to commit money laundering by transporting proceeds of unlawful drug activity from Kentucky to Texas, Mexico, and elsewhere, knowing that the property involved represented the proceeds of drug trafficking, both with the intent to promote the carrying on of drug trafficking, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and to conceal and disguise the nature, location, source, ownership, and control of the proceeds of this drug trafficking, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Viewed in the light most favorable to the Government, the evidence was sufficient to support that charge.

As already mentioned, the evidence at trial showed that large quantities of drugs were brought from Mexico into the United States and delivered to Dadanovic. Dadanovic then directed his subordinates, including Dugalic and others, to deliver the drugs to various regional distributors in multiple states, including Kentucky. Once the regional distributors sold the drugs, they sent money back to Dugalic and his colleagues, who in turn sent money back to Dadanovic. In order to facilitate this process, Dugalic worked personally to collect on debts from regional distributors, and Batlak delivered money to Dugalic and then to Dadanovic. Once Dadanovic was paid, he concealed the money and sent it back to Mexico in order to receive the next shipment of drugs. This is evidenced by the following facts: (1) just weeks after a Nissan truck was seen with Dadanovic, police stopped the same truck in Texas and seized over $230,000 from a hidden compartment inside; (2) Batlak testified that Dadanovic received drugs from Mexico; and (3) Dadanovic himself admitted that he had a "partner" in Mexico. All of this evidence reveals a cycle in which drugs went down the chain of Dadanovic's organization and drug money went back up the chain, in a concealed fashion, in order to keep the illegal enterprise going. That is precisely what the Government alleged in the indictment.

Nevertheless, Dugalic claims that the Government failed to present any evidence that he agreed to commit the crime of money laundering or that he knowingly joined the conspiracy. But that is not true. The Government put on proof that, after he distributed cocaine, Dugalic repeatedly received money from Batlak, worked personally to collect on debts from regional distributors, and sent money to Dadanovic, all before Dadanovic sent this money back to Mexico in anticipation of more drugs. Taken in the light most favorable to the Government, this evidence was more than

sufficient for the jury to find an agreement between Dugalic and his co-defendants to launder drug proceeds and that Dugalic knowingly and voluntarily joined that agreement. Accordingly, there was sufficient evidence for a reasonable jury to find that Dugalic conspired to commit money laundering.

4.

Dugalic next challenges the sufficiency of the evidence supporting the jury's finding on Count 3—that he conspired to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 846. Dugalic, however, does not dispute, in any meaningful way, the jury's findings that he conspired to distribute marijuana or that the conspiracy involved at least 100 kilograms of marijuana. Rather, Dugalic only argues that it was not "reasonably foreseeable to him" that the conspiracy involved at least 100 kilograms of marijuana, as opposed to some lesser quantity.

Dugalic's argument is without merit because the Government was not required to show that he knew the exact quantity of marijuana involved in order to obtain a conviction under § 846. *United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003). The Government however was only required to prove that Dugalic knew that "*some* quantity" of marijuana was involved. *Id.* at 438. The Government more than met its burden, introducing evidence that Dugalic and others discussed marijuana transactions, including transactions involving Jerdin Yanes; Batlak repeatedly delivered marijuana, including 500 pounds for Yanes; and Dugalic himself received marijuana from Yanes. In short, the Government presented sufficient evidence to convict Dugalic on Count 3.

5.

Dugalic was also not denied his Sixth Amendment right to a public trial. Dugalic's claim that "the district court denied the public access to the courtroom during the entirety of the closing

arguments" is inaccurate. In reality, the district court gave the parties and the public advance notice that, once closing arguments began, it would lock the courtroom doors in order to prevent the jury from being distracted by "anyone coming in and out." The district court then followed this procedure. Thus, the public was not denied access to the courtroom during closing arguments; it was merely prevented from entering and leaving the courtroom while those arguments were going on. Not only did Dugalic not object to the lack of distractions, he now fails to cite any legal authority suggesting that the district court's procedure was improper. Indeed, the case that Dugalic does cite, *Presley v. Georgia*, is clearly distinguishable because there the trial court expressly excluded the public from attending the jury voir dire. 130 S.Ct. 721, 722 (2010). Here, since the district court allowed the public to attend the entire trial, including closing arguments, it did not violate Dugalic's Sixth Amendment right to a public trial.

6.

The district court also did not abuse its discretion by refusing to conduct an in camera review of potential *Brady* material. We have recognized that a district court is not required to conduct an in camera review of such material where a prosecutor clearly represents to the district court that all *Brady* material has been disclosed to the defense and there is no evidence of misconduct by the prosecutor. *United States v. Carmichael*, 232 F.3d 510, 516-17 (6th Cir. 2000); *United States v. Hernandez*, 31 F.3d 354, 361 (6th Cir. 1994). Here, although one of Dugalic's co-defendants asked the district court to conduct an in camera review of notes from a police interview with Batlak to determine if redacted portions of those notes contained *Brady* material, the prosecutor told the district court that he had reviewed the notes in question and provided the defense with all *Brady*

material. Since there is no allegation or evidence of misconduct by the prosecutor, the district court did not abuse its discretion in declining the defense's request.

While Dugalic concedes that the district court was not required to conduct an in camera review, he argues that this court should nevertheless reverse his convictions because the district court mistakenly thought that it lacked the authority to do so. When defense counsel asked the district court to look at the exhibit for *Brady* material, the district court asked rhetorically, "Doesn't the U.S. get to make that call?" While somewhat unclear, the court's language can be taken as reflecting the rule of *Carmichael* and *Hernandez*, and we do not read the court's language as deeming itself barred from looking at the material in question. The district court asked the prosecutor if he had provided the defense with all *Brady* material and the prosecutor answered that he had. The district court relied on the prosecutor's answer and moved on. Since this was well within the district court's discretion, Dugalic's claim that the district court committed reversible error is baseless.

7.

Dugalic's sentence was also substantively reasonable. This court affords Dugalic's 365-month sentence a presumption of reasonableness because it falls within the applicable guidelines range. *See Rita v. United States*, 551 U.S. 338, 347 (2007). Dugalic has failed to rebut this presumption.

First, there is no merit to Dugalic's suggestion that the district court did not meaningfully consider that "the amounts [of cocaine] he directly was involved with are but a small percentage of the larger picture." The district court agreed with Dugalic "that at times he was seeking low level quantities of drugs," but found that Dugalic "was also involved in much larger quantities of drugs."

The district court correctly summarized the evidence, saying "this was a far-reaching international conspiracy where money was going to Mexico [and] significant quantities of drugs were coming in. The defendant Mr. Dugalic did bring people into the conspiracy, including the mother of his two children. He was a significant player in this case." Thus, despite Dugalic's suggestion to the contrary, the district court thoroughly and accurately considered the nature and circumstances of his offenses.

Second, Dugalic's argument that the district court failed to consider his history and characteristics is also baseless. Dugalic emphasizes that he has no criminal history and has two small children for whom he was the primary breadwinner. The district court expressly considered these factors, noting Dugalic's "absence of a criminal history" and the fact that a long prison sentence would leave Dugalic's children "without a father for a significant period of time." Nevertheless, after considering the extensive conspiracy in this case and balancing the remaining § 3553(a) factors, the district court found that a sentence in the middle of the guidelines range was appropriate. This was not an abuse of discretion.

Finally, Dugalic's claim that his case is akin to *United States v. Delgadillo*, 318 F. App'x 380 (6th Cir. 2009), is unavailing. In *Delgadillo*, this court remanded a case for resentencing because the district court "just briefly mentioned § 3553(a)" and did not address the defendant's history and characteristics at all. *Delgadillo*, 318 F. App'x at 386-87. Here, the district court thoroughly considered all of the § 3553(a) factors, including several aspects of Dugalic's history and characteristics, but found that, on balance, a sentence within the guidelines range was appropriate.

- 16 -

Accordingly, *Delgadillo* is clearly distinguishable from this case and Dugalic's argument that his sentence was substantively unreasonable is without merit.

## B. Hamilton's Appeal

On appeal, Hamilton argues that the district court erred by (1) not decreasing his offense level for acceptance of responsibility, (2) not decreasing his offense level for being a minor or minimal participant in the criminal activity, and (3) enhancing his offense level because he possessed a dangerous weapon. All of Hamilton's claims lack merit.

## 1.

The district court did not err in denying Hamilton's request for a decrease in his offense level pursuant to U.S.S.G. § 3E1.1(a), which permits a two-level reduction when the defendant "clearly demonstrates acceptance of responsibility for his offense." Because the district court "is in a unique position to evaluate a defendant's acceptance of responsibility," its determination "is entitled to great deference on review." U.S.S.G. § 3E1.1 cmt. n. 5. A defendant wishing to receive a reduction for acceptance of responsibility must prove facts entitling him to such a reduction by a preponderance of the evidence. *United States v. Bacon*, 617 F.3d 452, 458 (6th Cir. 2010).

The district court could properly determine that Hamilton did not satisfy his burden. The Sentencing Commission has noted that a § 3E1.1(a) "adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 cmt. n. 2. While Hamilton is correct that a "conviction by trial . . . does not automatically preclude a defendant from consideration for such a reduction," a defendant who is tried and convicted is

entitled to credit for acceptance of responsibility only in "rare situations," such as "where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.,* to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id*. Here, Hamilton argues that he admitted the essential factual elements of guilt and only went to trial to assert the "legal" defense of multiple conspiracies, claiming that while he may have conspired with Dugalic and Batlak to distribute cocaine, he was not a member of the large Dadanovic conspiracy. Although Hamilton argues that his multiple conspiracies defense "did not rest on issues related to factual guilt," this court has repeatedly said that "'[w]hether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury.'" *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003) (quoting *United States v. Schultz*, 855 F.2d 1217, 1222 (6th Cir. 1988)). Indeed, in this case, the district court instructed the jury, in accordance with the Sixth Circuit's pattern jury instructions 3.08 and 3.09, to consider a number of factors and determine whether a single or multiple conspiracies existed. The jury ultimately found that the Government proved the single conspiracy alleged in the indictment. In sum, while Hamilton characterizes his defense at trial as merely a legal challenge to the applicability of a statute to his conduct, the district court correctly found that he disputed a factual element of guilt and, therefore, was ineligible for a § 3E1.1(a) adjustment.

Despite Hamilton's claim to the contrary, this case is unlike *United States v. Gauvin*, 173 F.3d 798, 806 (10th Cir. 1999), in which the defendant "admitted to all the conduct with which he was charged," and "went to trial only to contest the legal element of intent." Here, the Government charged Hamilton with conspiring with Dadanovic and eleven others to distribute cocaine, but

Hamilton denied that charge and asserted at trial that he was only involved with Dugalic and Batlak.

Thus, unlike the defendant in *Gauvin*, Hamilton expressly challenged the facts surrounding his guilt,

making him ineligible for an acceptance of responsibility adjustment. Moreover, in *Gauvin* the

appellate court *upheld* the district court's grant of an acceptance-of-responsibility adjustment.

Hamilton erroneously argues that the district court failed "to make any specific findings of

fact as to whether he accepted responsibility for the crime for which he was convicted," and that it

"focused only on whether [his] choice to proceed to trial rendered him ineligible for an acceptance

of responsibility adjustment as a matter of law." The district court was only required to rule on the

parties' dispute over the application of § 3E1.1(a). FED. R. CRIM. P. 32(i)(3). The court did that,

finding that Hamilton was ineligible for an acceptance of responsibility adjustment because "[h]e

has disputed that he was a member of the Dadanovic conspiracy." Thus, Hamilton's suggestion that

he was "punished for defending himself" is not supported by the record.

Finally, Hamilton suggests that he should have received a § 3E1.1(a) adjustment because he

cooperated with authorities during a search of his home, truthfully told officers that he had firearms

in his house, and expressed remorse and contrition for his actions at sentencing. While this may be

true, in light of Hamilton's decision to go to trial and assert that he was not a member of the

Dadanovic conspiracy, the district court did not err in denying his request for an acceptance of

responsibility adjustment.

2.

The district court also did not err in denying Hamilton's request for a mitigating role

reduction pursuant to U.S.S.G. § 3B1.2, which authorizes a four-level reduction in offense level if

the defendant is deemed a "minimal" participant in the criminal activity, a two-level reduction if he is deemed a "minor" participant, and a three-level reduction if he falls somewhere in between.

In rejecting the minor-participant reduction, the district court cited several cases from this court holding that a defendant is ineligible for a mitigating role reduction if he is held accountable only for the quantity of drugs attributable to him. *See, e.g., United States v. Hutchins*, 334 F. App'x 748, 750-51 (6th Cir. 2009); *United States v. Bailey*, 488 F.3d 363, 369-70 (6th Cir. 2007); *United States v. Maynard*, 94 F. App'x 287, 294 (6th Cir. 2004). We do not rely on these holdings today, however. They all rely, either directly or indirectly, on other case law interpreting an old version of the Sentencing Guidelines. Since November 1, 2001, the Sentencing Commission has said that a defendant is *not* precluded from being considered for a mitigating role reduction simply because he is held accountable only for the quantity of drugs attributable to him. U.S.S.G. § 3B1.2 cmt. n. 3(A).

We need not resolve the extent to which these cases have continuing validity, however, because the district court made sufficiently clear that it would have found that Hamilton was not entitled to a mitigating role reduction in any event. In response to Hamilton's objection to being denied this reduction, the PSR stated that "it appears he played a crucial role in the organization's drug trafficking activities as one of several regional-level distributors. While he held no position of authority or responsibility, he was not 'substantially less culpable' than his co-defendants in perpetuating the conspiracy to traffic in illegal drugs." At the sentencing hearing, when asked to award a reduction for being a minor participant, the court responded,

Let me ask you this. If he—I would agree with you wholeheartedly, if he was held responsible, which I'm happy to do, for the 300 kilograms, and then give him a minor role, there's no question that's what probation's saying here, is that he's a regional level distributor, and he's less culpable than Mr. Dadanovic or the Dugalics.

They say it appears he played a crucial role in the organization's drug-trafficking activities as one of several regional level distributors. While he held no position of authority or responsibility, he was not substantially less culpable than his co-defendants in perpetuating the conspiracy.

If he was held responsible for the entire quantity as a member of the conspiracy, then vis-a-vis Dadanovic and the Dugalics, there's no question he should get a minor role. But if he's only—and there's a lot of case law on this actually—if he's only held responsible for his level of drugs, in other words, the regional level of drugs, which he was in charge of, just—I'm not saying he deserves an enhancement, then he would be—then there's no—it doesn't seem to me there's a minor role. And there's all kinds of case law on this that I can cite to you.

. . .

All of these [cases] hold that a defendant is ineligible for a mitigating role reduction if he is held accountable only for the quantities of drugs attributable to him.

In some sense, I don't know that I agree whole—I know they're published; I know they're binding, so I accept them. I don't agree wholeheartedly that they can never get it because I think—*this isn't the situation*, but there could be a situation where even though they're held accountable for the drugs attributable to them, there is a situation where they have a minor role. In other words, a low level player who's just dealing little chunks in a large conspiracy if—for example, Mr. Hamilton was held accountable, you could make an argument that it was reasonably foreseeable to him that all 300 kilograms. And then you could—I mean, I would say he was entitled to a minor role vis-a-vis the major conspiracy. But it doesn't matter. That's dictum; it has nothing to do with this case, so I won't get into that. But I do recognize those holdings. I recognize they're binding on me, and *in any event, I think it's appropriate here whether they were binding on me or not*, and so that objection's overruled.

R. 657 at 13-16 (emphasis added). This excerpt shows clearly that the district court would have

denied the minor participant reduction even if the cases in question were not applied. Thus, even

if Hamilton was eligible for a mitigating role reduction, the district court still found that he was not

a minor or minimal participant in the criminal activity. Since this finding is supported by the evidence, including but not limited to the testimony of Batlak, the district court did not err in denying Hamilton's request for a mitigating role reduction.

3.

The district court also did not err by enhancing Hamilton's offense level pursuant to U.S.S.G. § 2D1.1(b)(1), which states that "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels." The Government bore the initial burden of proving, by a preponderance of the evidence, that Hamilton possessed a dangerous weapon during the commission of the offense or other relevant conduct. *United States v. Kimbrough*, 376 F. App'x 592, 596-97 (6th Cir. 2010). The burden then shifted to Hamilton to show that it was "clearly improbable" that the firearm was connected to the offense. *Id.* at 596. While the Government met its burden, Hamilton failed to meet his burden.

The Government proved that Hamilton possessed multiple firearms. On October 15, 2009, DEA agents arrested Hamilton, searched his residence, and seized three firearms, including a Romarm/Cugir Model SAR-1 7.62 mm rifle (in a case with two loaded magazines and 17 rounds of ammunition) and a Stag Arms Model Stag 15 5.56 mm rifle (in a case with two loaded magazines and 40 rounds of ammunition), as well as numerous boxes of 7.62 mm ammunition and a loaded 100-round magazine.

Circumstantial evidence supports the conclusion that Hamilton possessed these weapons during the time of the conspiracy charged—from July 2007 "through on or about October 13, 2009." It is certainly logical to conclude that Hamilton did not collect all of his weapons in the two days

between October 13, 2009, when the conspiracy ended, and October 15, 2009, when DEA agents searched his residence. Moreover, the type of guns and amount of ammunition that Hamilton possessed strongly suggest that the weapons were for use in the drug trade. As the district court put it: this case "is far from the unloaded hunting rifle in the closet." Thus, the district court did not err in finding that Hamilton possessed dangerous weapons during the commission of his offense.

Lastly, Hamilton did not show that it was "clearly improbable" that the weapons he possessed during the conspiracy were used in connection with the offense. In determining whether a firearm was related to a particular drug offense for purposes of U.S.S.G. § 2D1.1(b)(1), we consider several factors, such as the proximity of the weapon to the drugs, the type of firearm involved, whether it was loaded, and any alternative purpose for the gun's presence. *United States v. Moses*, 289 F.3d 847, 850 (6th Cir. 2002) (citing *United States v. Hill*, 79 F.3d 1477, 1486 (6th Cir. 1996)). These factors do not help Hamilton. First, Hamilton's firearms were found within five feet of a small amount of marijuana. Although Hamilton was not charged with conspiring to distribute marijuana, the Government did introduce evidence that Dadanovic's organization distributed large amounts of marijuana and that, in May 2009, Batlak delivered several pounds of marijuana to Hamilton at his residence. Second, Hamilton does not dispute that the type of guns and ammunition he possessed are commonly used in the drug trade. Third, while it is unclear if Hamilton's firearms were loaded, several of his magazines were loaded. Finally, Hamilton offers no alternative explanation for the presence of these firearms in his residence. In sum, none of the foregoing factors helps Hamilton show that it is "clearly improbable" that his guns were related to the conspiracy to distribute cocaine. Thus, the district court did not err in imposing the two-level § 2D1.1(b)(1) enhancement.

III.

For the foregoing reasons, we affirm Dugalic's conviction and sentence and affirm

Hamilton's sentence.